******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DANIEL W.*

## (AC 39844)

Prescott, Elgo and Norcott, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the first degree, risk of injury to a child, sexual assault in the fourth degree, conspiracy to commit risk of injury to a child, attempt to commit sexual assault in the first degree and attempt to commit risk of injury to a child in connection with his alleged sexual abuse of the minor victim, A, the defendant appealed to this court. He claimed, inter alia, that the trial court improperly admitted certain evidence of his alleged uncharged, prior sexual misconduct as to another minor victim, C, and improperly allowed a social worker, who had testified as a constancy of accusation witness, to testify as an expert regarding delayed disclosures of and common behaviors by child victims of sexual abuse. The defendant, who was married to A's sister, J, had sexually abused A when A would visit their home to spend time with J and other relatives. The abuse occurred when the defendant and A were alone, and in the presence of J and M, the defendant's minor daughter from a previous marriage. J also engaged in certain sexual abuse of A at the defendant's behest, and when the defendant and J engaged in certain sexual conduct in front of A, he also had J ask A to join them in that conduct. *Held*:

1. The trial court did not abuse its discretion in admitting certain uncharged sexual misconduct evidence through the testimony of C in order to prove that the defendant had a propensity to sexually assault young girls: the defendant's initial advances toward C and A were sufficiently similar, as both girls were assaulted when they were overnight guests in his home, the defendant commenced the abuse while the girls were sleeping, the acts of assault were nearly identical in that C and A both testified that the defendant reached under their clothes and touched their vagina, and may have taken photographs of them, and the abuse occurred with others in the same room; moreover, C and A were similarly situated because they shared a similar relationship with the defendant through J and M, which facilitated the defendant's abuse of C and A by providing him access to them, C and A were both prepubescent and similar in age when certain of the abuse occurred, and the abuse of C occurred when she was only one year older than A had been when the abuse of A ended, and although the defendant's abuse of A was more severe and more frequent than his abuse of C, those differences were due to the fact that the defendant had access to C on only one occasion, whereas he had frequent access to A; furthermore, the uncharged misconduct evidence was not unduly prejudicial because it allowed the jury to conclude that the defendant had a propensity to sexually assault young girls, which is the precise purpose for which such evidence is allowed to be admitted, the defendant offered no explanation regarding how the uncharged misconduct evidence tended to show something other than that propensity, and it was unlikely that C's testimony improperly aroused the emotions of the jury, as the misconduct as to her was far less egregious than that as to A.

2. The defendant could not prevail on his claim that the trial court improperly permitted the social worker to testify as an expert on delayed disclosure by and common behaviors of child sexual abuse victims, which was based on the defendant's assertion that she was unqualified to testify as an expert and had previously testified as a constancy of accusation witness:

   a. The defendant's unpreserved claim that the social worker's testimony exceeded the bounds of permissible constancy of accusation evidence was not reviewable, as the record indicated that the trial court did not understand the defendant to have objected to her testimony because it exceeded the proper scope of the constancy of accusation doctrine, and the defendant's many stated bases for his objection at trial were not consistent with the claim he made on appeal.

b. The trial court did not abuse its discretion in determining that the social worker was qualified to render an expert opinion on the topic of delayed disclosure; the social worker had practical experience and relevant educational background regarding the issue of delayed disclosure, as she had studied characteristics of child victims of sexual abuse in obtaining her bachelor's and master's degrees, she had received training on how to handle a student's first disclosure of abuse and, while she was employed as a school social worker and was the director of a youth group, she had been told by approximately fourteen students that they had been sexually abused.

3. The defendant's claim that he was deprived of a fair trial as a result of certain improprieties committed by the prosecutor during trial and closing argument was unavailing; even if the prosecutor's comments during closing argument and questions on cross-examination constituted impropriety, the defendant was not deprived of a fair trial because even though the prosecutor's comments were not invited by the defendant and pertained to the critical issue of whether A and C had a motive to lie about the defendant's sexual abuse of them, the potential impropriety was neither severe nor frequent, the trial court's instructions to the jury were sufficient to correct any confusion the jury may have had regarding the state's burden of proof, and the state's case was strong overall, as A's testimony was directly corroborated in part by J, and A's allegations were further corroborated by C's testimony concerning certain uncharged misconduct by the defendant and by the defendant's own written statements in certain letters he had written to J that were admitted into evidence.

Argued November 16, 2017—officially released March 6, 2018

*Procedural History*

Substitute information charging the defendant with seven counts of the crime of risk of injury to a child, five counts of the crime of sexual assault in the first degree, and with one count each of the crimes of sexual assault in the fourth degree, conspiracy to commit risk of injury to a child, attempt to commit sexual assault in the first degree and attempt to commit risk of injury to a child, brought to the Superior Court in the judicial district of Tolland, where the court, *Graham, J.*, granted the state's motion to introduce certain evidence; thereafter, the matter was tried to the jury; subsequently, the court denied the defendant's motion to preclude certain evidence; verdict of guilty; thereafter, the court denied the defendant's motion for a new trial and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed.*

*Alice Osedach*, senior assistant public defender, for the appellant (defendant).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Elizabeth C. Leaming*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Daniel W., appeals from the judgment of conviction, rendered after a jury trial, of six counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2); five counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2); one count of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a) (2) and 53a-49; one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A); one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1); one count of conspiracy to commit risk of injury to a child in violation of General Statutes §§ 53-21 (a) (2) and 53a-48; and one count of attempt to commit risk of injury to a child in violation of General Statutes §§ 53-21 (a) (2) and 53a-49. On appeal, the defendant claims that (1) the trial court improperly admitted evidence of his prior misconduct; (2) the trial court improperly allowed a constancy of accusation witness to testify as an expert regarding delayed disclosure; and (3) the prosecutor committed improprieties that deprived the defendant of his right to a fair trial.[1] We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. A was seven years old when the defendant began sexually abusing her in 2004. A met the defendant one year earlier, when her brother was enrolled in one of his martial arts classes. A's older sister, J, brought their brother to and from the class.

When J became eighteen years old, she and the defendant, who was thirty-six years old at the time, began dating. Soon after, J moved out of her parents' house and began living with the defendant in an apartment in Rockville. She and the defendant married and eventually had three children together.

A often stayed at J's and the defendant's apartment on weekends. She enjoyed spending time with her sister, nieces and nephews, and the defendant's daughter from a previous marriage, M, who is close in age to A.[2] A slept in a bed in M's room when she visited.

On one such weekend when A was seven, the defendant came into M's room at night, where M and A were sleeping, put his hand underneath A's pajama shirt, and began touching her chest. The defendant then put his hands down A's pajama pants and touched her vagina. A pretended to be asleep during this encounter. Thereafter, the defendant abused A in a similar manner on multiple occasions.

Over time, the defendant's abuse of A increased in severity. Specifically, the defendant would enter M's room at night, go over to A's bed, rub A's vagina, and penetrate it with his finger. A recalled that the defendant

abused her in this way "[t]oo many times to count." On other occasions, the defendant put his penis in A's mouth, at times ejaculating. Furthermore, A believes that the defendant often photographed her naked body, as he sometimes came into her room and pulled her clothes off, after which she would see flashes of light.

During each instance of abuse, A kept her eyes closed and pretended to be asleep because she was afraid that the defendant, who had a bad temper and held a fourth-degree black belt, might hurt her. A was still able to identify the defendant as her abuser, however, because (1) his hands felt like a man's hands, and the defendant was the only adult male in the apartment, and (2) the defendant, who drank often, smelled of alcohol. Despite the abuse, A continued to visit J's and the defendant's apartment, as she loved spending time with her relatives and was determined not to let the defendant "ruin [her] fun with them."

On another occasion when A was eight years old, the defendant came into M's room and picked A up from her bed. M woke up and asked her father what he was doing. The defendant told her that he was bringing A to the bathroom. The defendant then carried A to his and J's bedroom, laid her down on their bed, and performed oral sex on her. Afterward, he carried A back to her bed.

Another time, the defendant, J and A were in the living room watching a movie when J began performing fellatio on the defendant. The defendant told J to ask A if she wanted to join. J then twice asked A if she wanted to participate. A declined and stared at the television. When the movie finished, A walked into M's room. No further abuse occurred on that night.

When A was ten years old, the defendant again picked A up from her bed and carried her to his bedroom. A awoke and heard J ask the defendant, "what if she wakes up?" to which the defendant replied, "don't worry, she shouldn't." The defendant then encouraged J to fondle A, and J put her hand up A's shirt and began touching her chest. Meanwhile, the defendant pulled down A's pants and began performing oral sex on her. Eventually, the defendant stopped and carried A back to her bed.

The last instance of abuse occurred when A was twelve years old. On that night, A fell asleep on the couch in the living room while watching television. At some point, A heard the defendant come home from work. Thereafter, A heard a "rustling" sound, which she later learned was a condom being opened. The defendant then climbed on top of A and attempted to penetrate her vagina with his penis. When he was unable to fully do so, he stopped and walked out of the room. Sometime later J came into the living room. A cried out to her, and revealed to her sister that the defendant

had tried to molest her. J told A that she would yell at the defendant and that it would not happen again. J then walked out of the room and came back with the defendant, who was "freaking out, saying how he [was] going to go to jail . . . [and] not going to see his kids anymore." J told him not to worry and that "[A was] not going to do that." After this incident A rarely, if ever, returned to J's and the defendant's apartment.

In 2012, the defendant lost his job and he, J, and their children moved into J's parents' house, where A also lived. While he was living in the family home, A often voiced her dislike of the defendant and kept her bedroom door locked.

In June, 2013, the defendant was arrested on charges stemming from a domestic violence incident during which he struck J in the face in front of their son. J's and A's father subsequently ejected the defendant from the house, and he did not return.

For years, A did not disclose the abuse because she feared that the news would break up her sister's family. Furthermore, A felt betrayed by J's response to her revelation that the defendant had tried to molest her.

In 2013, however, the defendant was arrested for sexually abusing another girl.[3] When this happened, A's father asked her whether the defendant had also sexually abused her. A responded that the defendant had tried to put his hands down her pants, but refused to say anything more. When A's father suggested reporting the abuse to the police, she said that she did not want to because her classmates would find out. A's father, wanting to protect A, did not tell his wife or anyone else about the conversation.

On March 6, 2014, when A was seventeen years old, she attended a youth group meeting at her church. Suzy Williams, an adult mentor for the group and a social worker, often brought A to the meetings. After the meeting, A told Williams that it was the best day of A's life because the man who had sexually abused her for years had been arrested, and she would never have to see him again. A also told Williams that the abuser was her brother-in-law, who was married to her sister, J. Williams asked whether the defendant had had sex with A, and she responded that he had "went as far as he could go."

Williams, who was a mandated reporter of suspected child abuse, alerted the Department of Children and Families (department) and the police as to what A had told her. The defendant subsequently was arrested on charges arising from his abuse of A and tried before a jury.

At trial, the court admitted into evidence three letters written by the defendant to J.[4] In the letters, the defendant, angry that J was not writing him back, threatened to reveal her role in A's abuse. Specifically, the defen-

dant stated that J "not only [knew] what was going on but . . . helped and supported in it," and that, on many nights, J made arrangements for the older children so that they were not in the house, presumably to facilitate the defendant's abuse of A. The defendant also wrote that the police wanted him "to confirm that [J] gave [him] a BJ in front of [A]."

The defendant was subsequently found guilty by the jury on all charges contained in the state's substitute information and sentenced to a total effective term of twenty-nine years incarceration followed by sixteen years of special parole. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly admitted into evidence uncharged misconduct of the defendant through C, who testified that the defendant sexually abused her. Specifically, the defendant argues that the uncharged misconduct was not sufficiently similar to the charged conduct, and that the prejudicial effect of its admission outweighed its probative value. We disagree.

The following additional facts and procedural history are relevant to the resolution of this claim. On July 30, 2015, the state filed a motion to join for trial three separate cases alleging sexual misconduct against the defendant. On August 26, 2015, the defendant filed an objection to the state's motion for joinder. That same day, the court held a hearing on the state's motion. At the hearing, the state amended its motion, requesting to join only two of the three cases—those involving A and C. The state argued that joining those two cases was appropriate because the evidence in each case would likely be cross admissible pursuant to the standard for introduction of uncharged sexual misconduct set forth in *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008). The defendant responded that doing so would substantially prejudice him because the severity of misconduct alleged in the case involving A was far greater than that alleged in the case involving C.

The court denied the state's motion, finding that, although the respective incidents of alleged abuse as to A and C were not too remote in time, and C and A were similarly situated, the alleged abuse of A and C was not sufficiently similar to warrant trying the cases together. Specifically, the court found that the defendant's abuse of A was far greater in duration, frequency, and invasiveness. Moreover, the court found that introducing evidence of the defendant's alleged abuse of A in the trial concerning his alleged abuse of C would be more prejudicial than probative. The court made clear, however, that its ruling did not preclude the admissibility of the defendant's alleged abuse of C in the trial concerning his abuse of A.

On September 28, 2015, the defendant filed a motion in limine in the present case, in which he sought to preclude the admission of uncharged misconduct evidence at trial, arguing that any such evidence was not relevant and, even if deemed relevant, its prejudicial effect outweighed its probative value. The next day, the state filed a notice of its intent to introduce uncharged misconduct evidence at trial "to establish the defendant's propensity to sexually assault young girls . . . ."

On October 5, 2015, the court heard argument on the defendant's motion in limine. At that time, the prosecutor made an offer of proof regarding the anticipated testimony of C. Specifically, the state proffered that (1) C, like A, was a minor when she was allegedly abused by the defendant; (2) C was friends with the defendant's daughter, M, and was "like a little sister" to J; (3) on the day of the alleged abuse, C spent the night at the defendant's house and fell asleep on the couch in the living room watching a movie with the defendant and J; (4) on three separate occasions throughout the night and into the morning the defendant attempted to touch C's vagina while she was sleeping, both over and under her clothes; and (5) C believed that the defendant also may have taken photographs of her.

The state argued that the uncharged misconduct evidence was relevant because it was not too remote in time to the last alleged incident of abuse of A, which had occurred about one year prior. The state also argued that the charged and uncharged misconduct were sufficiently similar because C, like A, alleged that the defendant had touched her vagina over and under her clothes while she was sleeping. Furthermore, the state argued that the escalation of the abuse of A did not preclude admissibility of C's testimony because the defendant had access to C for only a short period of time and, therefore, the defendant did not have an opportunity to escalate his abuse of her. Finally, the state argued that the prejudicial effect of the uncharged misconduct evidence did not outweigh its probative value because it supported the defendant's propensity to sexually assault young girls, and the defendant's alleged abuse of C was far less severe than that of A. In response, the defendant argued that the uncharged misconduct evidence was "detrimental" to him, and requested that, because the state had not proffered the live testimony of C, the court defer ruling on its motion until the defense could voir dire her.

The court subsequently granted the state's motion to introduce uncharged misconduct evidence through C, provided that C testified consistently with the state's proffer at trial. In doing so, the court concluded that the state's proffer satisfied the test set forth in *DeJesus* and that the probative value of the evidence outweighed its prejudicial effect.

At trial, C testified consistently with the state's proffer. Specifically, she testified that she was a childhood friend of the defendant's daughter, M. During the fall of 2011, J reached out to C, who was thirteen years old at the time, to arrange a sleepover with M at the defendant's apartment. When C arrived, however, M was not there. Instead, C spent the day with J and her two sons. That evening, J and C watched movies in the living room. The defendant arrived home at approximately 11 p.m. C fell asleep on the couch early the next morning, at about 3 a.m.

A short while later, C awoke to the defendant trying to touch her vagina over her sweatpants. C pushed him away, told him to move, and went back to sleep. Not long after that, C awoke again to the defendant touching her vagina—this time under her clothes. She pushed him away and asked him what he was doing. C then awoke a third time to the defendant grabbing her vagina over her sweatpants. This time, C asked the defendant, "[w]hat the hell was wrong with [him]." The defendant grabbed C's arm and told her not to say anything. C then told J, who was also in the living room during the three incidents, what had happened. J responded that the defendant must have thought C was her. C told J she was lying and called her guardian to come pick her up.

After C testified, the court gave the jury a limiting instruction regarding the proper use of uncharged misconduct evidence. Specifically, the court instructed the jury that evidence of the defendant's misconduct toward C was not sufficient to prove that the defendant was guilty of the crimes charged. The court further instructed the jury that the state still had the burden of proving every element of the crimes charged beyond a reasonable doubt. In its final charge, the court instructed the jury a second time about the proper use of uncharged misconduct evidence.[5]

On October 26, 2015, after the defendant was found guilty, he filed a motion for a new trial wherein he claimed, inter alia, that the court improperly admitted the uncharged misconduct evidence. On January 8, 2016, after argument, the court denied the defendant's motion.

We begin our analysis of the defendant's claim by setting forth the applicable standard of review. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [Every] reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Heck*, 128 Conn. App. 633, 638, 18 A.3d 673, cert. denied, 301 Conn. 935, 23 A.3d 728 (2011).

Turning to the applicable law, as a general rule, prior misconduct evidence is inadmissible to prove the defendant's bad character or criminal tendencies. See Conn. Code Evid. § 4-5 (a) ("[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection [b]"). In *State* v. *DeJesus*, supra, 288 Conn. 470, however, our Supreme Court recognized "a *limited* exception to the prohibition on the admission of uncharged misconduct evidence in *sex crime* cases to prove that the defendant had a propensity to engage in aberrant and compulsive criminal sexual behavior." (Emphasis in original.) This exception to the admission of propensity evidence was subsequently codified in § 4-5 (b) of the Connecticut Code of Evidence.

Under § 4-5 (b) of the Connecticut Code of Evidence and *DeJesus*, evidence of uncharged sexual misconduct is admissible "if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged." *State* v. *DeJesus*, supra, 288 Conn. 473. "[E]vidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the [complaining] witness." (Internal quotation marks omitted.) Id. In addition, the court must also find that the probative value of the evidence "outweighs the prejudicial effect that invariably flows from its admission." (Internal quotation marks omitted.) Id.

To begin, the defendant concedes, and we agree, that the charged and uncharged misconduct was not too remote in time. The abuse of A occurred between 2004 and 2010, and the abuse of C occurred in 2011. Because the defendant's abuse of C occurred only one year after the last instance of abuse with respect to A, the uncharged conduct is not too remote in time relative to the charged conduct. See *State* v. *Acosta*, 326 Conn. 405, 415, 164 A.3d 672 (2017) (holding that twelve year gap between charged and uncharged conduct was not too remote); *State* v. *Jacobson*, 283 Conn. 618, 632–33, 930 A.2d 628 (2007) (ten year gap was not too remote); *State* v. *Romero*, 269 Conn. 481, 498, 849 A.2d 760 (2004) (nine year gap was not too remote).

The defendant does, however, challenge the court's finding that the uncharged misconduct is sufficiently similar to the charged conduct under *DeJesus* and § 4-5 (b) of the Connecticut Code of Evidence. The defendant argues that the uncharged and charged conduct is dissimilar because the defendant's abuse of A was more frequent and severe than his abuse of C.

"It is well established that the . . . conduct at issue need only be similar—not identical—to sustain the admission of uncharged misconduct evidence." (Internal quotation marks omitted.) *State* v. *Acosta*, supra, 326 Conn. 416. Although it is true that "frequency and severity are factors relevant to the similarity of abuse analysis"; *State* v. *Antonaras*, 137 Conn. App. 703, 719, 49 A.3d 783, cert. denied, 307 Conn. 936, 56 A.3d 716 (2012); "[i]n a number of cases, our Supreme Court and this court have looked to the initial sexual advances of the defendant in comparing the similarity of the uncharged misconduct to the charged abuse, especially when the uncharged misconduct witnesses *rebuffed the advances or the defendant otherwise was prevented from abusing them.*" (Emphasis added.) Id., 717–18. Thus, "differences in the severity of misconduct may not illustrate a behavioral distinction of any significance when a victim rebuffs or reports the misconduct." (Internal quotation marks omitted.) *State* v. *Acosta*, supra, 416.

Undoubtedly, the defendant's abuse of A was more severe, and more frequent, than his abuse of C. The differences in severity and frequency of the abuse, however, are due to the fact that (1) the defendant had access to C on only one occasion, whereas he had frequent access to A, and (2) C rebuffed his advances. When these circumstances are present, our case law directs us to consider whether the defendant's initial sexual advances toward each witness were sufficiently similar in analyzing the second relevancy prong of *DeJesus*, rather than comparing the severity and frequency of the conduct overall. See *State* v. *Antonaras*, supra, 137 Conn. App. 717–19.

In the present case, there were significant similarities between the defendant's initial advances toward C and A. Both girls were assaulted when they were staying as overnight guests in the defendant's home. See id., 719–21 (location of abuse is factor courts consider in evaluating similarity of charged and uncharged misconduct; abuse of three victims occurred either in defendant's vehicle or residence); see also *State* v. *L.W.*, 122 Conn. App. 324, 333–34, 999 A.2d 5 (charged and uncharged conduct sufficiently similar where, "[i]n both instances, the alleged sexual misconduct occurred surreptitiously and in the defendant's residence"), cert. denied, 298 Conn. 919, 4 A.3d 1230 (2010). Furthermore, the defendant commenced the abuse while the girls were sleeping. See *State* v. *Hickey*, 135 Conn. App. 532, 546, 43 A.3d 701 (charged and uncharged misconduct sufficiently similar in part because defendant's abuse of both victims occurred when they were asleep at his residence), cert. denied, 306 Conn. 901, 52 A.3d 728 (2012).

Moreover, the acts of assault themselves were nearly identical—both witnesses testified that the defendant

reached underneath their clothes and touched their vagina, and may have taken photographs of them. Finally, the defendant's abuse of both witnesses occurred with others in the same room. The defendant abused A while she was sleeping in the same bedroom as his daughter, M, and abused C when J was in the room. See *State* v. *Eddie N. C.*, 178 Conn. App. 147, 161, 174 A.3d 803 (2017) (whether abuse occurred in vicinity of others is factor courts consider in evaluating similarity of charged and uncharged conduct; uncharged conduct was sufficiently similar to charged conduct in part because abuse of both witnesses occurred in vicinity of family members), cert. denied, 327 Conn. 1000,     A.3d     (2018). Thus, the defendant's initial advances toward C and A were sufficiently similar.[6]

The third relevancy prong of *DeJesus* requires us to evaluate whether the uncharged misconduct was committed against an individual similar to the complaining witness. *State* v. *DeJesus*, supra, 288 Conn. 473. The defendant appears to argue that A and C are dissimilar because "of the defendant's different relationship with each complainant." Specifically, C, unlike A, was not related to the defendant's wife. The defendant further argues that the two are dissimilar because A was seven years old when the abuse began while C was thirteen, making her "more likely to have reached puberty . . . ."

"As with conduct, the victim[s] . . . at issue need only be similar—not identical—to sustain the admission of uncharged misconduct evidence. . . . Age and familial status may suggest victim similarities. (Citation omitted; internal quotation marks omitted.) *State* v. *Acosta*, supra, 326 Conn. 417–18.

The defendant is incorrect that A and C are dissimilar because he shared a familial relationship with A and not C. Certainly, courts have taken into account whether the misconduct and complaining witness share a familial relationship with the defendant in evaluating the witnesses' similarity. The reason for this, however, is that the familial relationship often facilitates the abuse because it provides the defendant access to the victims. See *State* v. *Devon D.*, 321 Conn. 656, 667, 138 A.3d 849 (2016) ("[b]ecause of the familial relationship [that the misconduct and complaining witnesses shared with the defendant], the defendant had access to and time alone with each victim"). What is significant is not that those relationships are familial, but that the misconduct and complaining witness share a similar relationship with either the defendant, or another individual, through whom the defendant is able to gain access to them.

Here, it was each girl's relationship to J and M—not the defendant—that allowed the defendant access to them. During the hearing on the defendant's motion in limine to exclude uncharged misconduct evidence, the

state proffered that A visited the defendant's apartment to spend time with her sister, J, as well as the defendant's daughter, M, with whom she shared a friendship. With respect to C, the state proffered that she spent the night at the defendant's apartment because of her friendship with M. The state further proffered that C was "like a little sister to [J] as well." Thus, A and C were similarly situated in that they were connected to the defendant through J and M, and those similar relationships "offered the defendant access to [them] and the opportunity for his actions." *State* v. *Acosta*, supra, 326 Conn. 418; see also *State* v. *George A.*, 308 Conn. 274, 297, 63 A.3d 918 (uncharged misconduct witness and complaining witness were sufficiently similar despite fact that only complaining witness was related to defendant).

Furthermore, A and C were both prepubescent and similar in age when the abuse occurred. Although the defendant's abuse of A began when she was seven, it continued until she was twelve years old. The defendant abused C when she was thirteen, only one year older than A had been when the abuse ended. Thus, the court did not abuse its discretion in concluding that A and C were sufficiently similar individuals. See *State* v. *Allen*, 140 Conn. App. 423, 434–35, 59 A.3d 351 (uncharged misconduct witness, who alleged that defendant abused her between ages of nine and fifteen, and complaining witness, who alleged that defendant abused her between ages of seven and eleven, were sufficiently similar), cert. denied, 308 Conn. 934, 66 A.3d 497 (2013).

Having determined that the court did not abuse its discretion in concluding that the uncharged misconduct evidence was relevant to prove that the defendant had a propensity to engage in aberrant sexual misconduct, we now address the defendant's claim that the prejudicial impact of the uncharged misconduct evidence "greatly outweighed [its] limited probative value . . . ." Specifically, the defendant argues that C's testimony allowed the state to argue that he "had a tendency or propensity to sexually abuse young girls," and caused the jury to believe that he "was a brazen and persistent abuser."

"In balancing the probative value of such evidence against its prejudicial effect . . . trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 288 Conn. 473–74. "Although evidence of child sex abuse is undoubtedly harmful to the defendant, that is not the test of whether evidence is unduly prejudicial. Rather, evidence is excluded as unduly prejudicial when it tends to have some adverse effect upon a defendant *beyond* tending to prove the fact or issue

that justified its admission into evidence." (Emphasis in original; internal quotation marks omitted.) *State* v. *Antonaras*, supra, 137 Conn. App. 722–23. "The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Morales*, 164 Conn. App. 143, 179, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016).

The defendant argues that the admission of the uncharged misconduct evidence was unduly prejudicial because it allowed the state to argue, and the jury to conclude, that he had a propensity to sexually assault young girls. This assertion does not support the defendant's contention that the evidence was unduly prejudicial, as propensity is the precise purpose for which our legislature and courts have allowed such evidence to be admitted and considered. See *State* v. *DeJesus*, supra, 288 Conn. 476. Moreover, the fact that the evidence is harmful to the defendant does not make it unduly prejudicial—uncharged misconduct evidence is always harmful. Such evidence crosses the threshold from harmful to unduly prejudicial only when it has some adverse effect *beyond* tending to show the defendant's propensity to commit that type of misconduct. The defendant offers no explanation regarding how the uncharged misconduct evidence tended to show something other than his propensity to sexually assault young girls and, as we have already noted, that is a proper purpose for which it may be considered. Furthermore, the defendant's misconduct as to C was far less egregious than that as to A. It is therefore unlikely that C's testimony improperly aroused the emotions of the jury. We conclude that the court did not abuse its discretion in admitting the uncharged misconduct evidence.

II

Next, the defendant claims that the trial court improperly permitted Williams to testify as an expert on delayed disclosure and common behaviors of child sexual abuse victims because she (1) had already testified as a constancy of accusation witness, and (2) was unqualified[7] to testify as an expert. We decline to review the former assertion because it was not preserved at trial and, with respect to the witness' qualifications, we are not persuaded that the court abused its discretion in concluding that Williams was qualified to render her opinions.

The following additional facts are relevant to this claim. The defendant filed a motion in limine prior to trial to prevent the state from eliciting testimony from A regarding her disclosure of abuse to others unless the state had good cause to believe that those individuals would be available to testify. During the state's direct examination of A, A testified that she had disclosed the abuse to Williams, J, and her father. On cross-examina-

tion, the defendant challenged A's credibility and elicited from her that she did not reveal the abuse to Williams until 2014, that she never revealed the abuse to her mother, and that she had never sought medical treatment or therapy as a result of the abuse.

After A testified, the state called Williams. Williams testified that she was employed as a social worker at a high school. Regarding her background, Williams testified that she had received both a bachelor's degree in psychology and master's degree in social work from the University of Connecticut. Williams further testified that she had received her first level of licensure three months before the trial, was working toward her final level, and hoped to become a licensed clinical social worker (LCSW) by the end of the year. To become an LCSW, students are required to complete three thousand working hours, one hundred of which must be supervised by a licensed clinician.

Williams testified that, in order to complete the required clinical hours, she had volunteered as a director for a church youth group for the past ten years. It was through this volunteer work that Williams met A. Williams then testified regarding A's disclosure of the defendant's abuse. When the state asked Williams whether she thought it was important to press A for specific details, Williams replied, "I did not. Oftentimes when dealing with kids—." The defendant then objected, citing as the basis of the objection that Williams was not "qualified to give an opinion at [that] point."

The court excused the jury and asked the state what line of questioning it intended to pursue. The state responded that Williams had completed her constancy of accusation testimony, but that it also wanted to elicit testimony from Williams regarding her experience as a social worker interacting with children who disclose sexual abuse. Specifically, the state wanted to elicit that, in Williams' experience, children often delay in disclosing abuse. The state argued that Williams was permitted to testify about her observations and experience as long as such testimony was relevant.

The court then asked the state to voir dire Williams and thereby lay a foundation for her testimony regarding delayed disclosure and common characteristics of sexual abuse victims. During voir dire, Williams testified as to the following: (1) while working as the director of the church youth program, eight teenagers had disclosed sexual abuse to her, (2) Williams had attended two different trainings on how, as a mandated reporter, she should properly handle disclosures of sexual abuse by children, (3) as part of her training, Williams was taught that she should not press children for details of sexual abuse, (4) Williams also learned, through training, of various behaviors that children who are sexually abused commonly exhibit, including delayed disclo-

sure, (5) the purpose of Williams' training was to assist her in preparing to work with sexual abuse victims in the future, (6) during her work as a school social worker, five children had disclosed to Williams that they had been sexually abused, and (7) she had been the person to whom the students first disclosed abuse. Thereafter, the defendant also conducted a voir dire of Williams.

The state then clarified once again that it only sought to elicit from Williams (1) testimony as to how common it is for children to delay disclosing abuse, and (2) the reasons for that phenomenon. The defendant again objected.

The court then ruled that Williams was qualified to answer questions regarding delayed disclosure. The court based its ruling on the fact that Williams had received her master's degree in social work and acquired her first level of licensure, was close to obtaining her LCSW license, had training and practical experience interacting with school-age students who disclose sexual abuse, and had worked with a total of fourteen students who had done so. The court reminded both the state and Williams that she could not testify about why A may have delayed her disclosure or how her conduct was consistent with someone who had been sexually abused.

Thereafter, the jury returned and the court provided a limiting instruction regarding constancy of accusation testimony. The prosecutor then proceeded to question Williams about her training as a mandated reporter and the topic of delayed disclosure. Williams testified that, through her work as a social worker and director of the youth group, approximately thirteen or fourteen children had disclosed to her that they had been sexually abused. Regarding delayed disclosure, Williams testified that children often wait to disclose abuse because (1) they do not want to upset family members or friends who would be affected by the news, (2) they fear what will happen if their friends find out about the abuse, and (3) children often feel as though they did something to deserve the abuse and do not want that fear validated.

The court, during its final charge to the jury, subsequently gave an instruction regarding the proper purpose for which the jury could consider constancy of accusation and expert testimony. Specifically, the court instructed the jury that the testimony of the constancy of accusation witnesses "was . . . limited in its scope to the fact and timing of [A's] complaint, the place and nature of the alleged sexual assault, and the identity of the alleged perpetrator." Regarding expert testimony, the court instructed the jury that Williams had testified as an expert and that such testimony was entitled "to such weight as [the jury] find[s] the expert's qualifications in her field entitle it to receive . . . ."

## A

The defendant first argues that the court improperly allowed Williams to testify as an expert regarding delayed disclosure because she had also testified as a constancy of accusation witness. Specifically, the defendant argues that Williams' testimony improperly exceeded the bounds of permissible constancy of accusation evidence set forth in *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996). Because the defendant did not preserve this claim at trial, we decline to review it.

"In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . Our rules of practice make it clear that when an objection to evidence is made, a succinct statement of the grounds forming the basis for the objection must be made in such form as counsel desires it to be preserved and included in the record. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Bush*, 249 Conn. 423, 427–28, 735 A.2d 778 (1999).

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to a trial by ambush." (Citation omitted.) Id., 428. "Where, however, there is a question as to whether the claim was preserved, as long as it is clear from the record that the trial court effectively was alerted to a claim of potential error while there was still time for the court to act . . . the claim will be considered preserved." (Citation omitted; internal quotation marks omitted.) *State* v. *Francis D.*, 75 Conn. App. 1, 8–9, 815 A.2d 191, cert. denied, 263 Conn. 909, 819 A.2d 842 (2003).

The issue of whether the defendant's claim is properly preserved in this case is almost identical to that presented in *Francis D*. See id., 8. In that case, the defendant argued on appeal that because a social worker who testified for the state at trial was "offered solely to prove constancy of accusation, her testimony regarding the theory of delayed disclosure was inadmissible." Id. There, this court similarly concluded that the defendant had not preserved his claim for appellate review. Id. In so concluding, the court found that "[n]one of the defendant's objections concerned whether the testimony of the social worker exceeded the limits of *Troupe*. Instead, the explicit ground asserted for the defendant's objections was that the social worker was not qualified as an expert witness and, therefore, her testimony regarding delayed disclosure violated his

constitutional right to a jury trial because it allegedly usurped the jury's function of assessing the credibility of [the witness]." Id., 10. The court also noted that "[t]he defendant's objections failed to provide enough background to properly articulate the basis of the objection," and that "[a]t no time during the colloquy did the defendant raise *Troupe* or state that the witness was a constancy of accusation witness who could testify only within the parameters of *Troupe*." Id.

In the present case, as in *Francis D.*, the defendant did not at any point state as a basis for his objection that Williams' testimony improperly exceeded the scope of constancy of accusation evidence under *Troupe* or its progeny. The defendant initially stated that the basis for his objection to Williams testifying further was that she was not qualified to give an opinion "at [that] point." After the court ruled that Williams would be allowed to testify regarding delayed disclosure, the defendant subsequently reiterated his objection. In doing so, the defendant stated three grounds as the basis for the objection: (1) the state had not disclosed to the defendant prior to trial that Williams would testify as an expert, (2) the state was attempting to improperly bolster A's credibility, and (3) Williams did not qualify as an expert in that field because she did not have the necessary experience.

The defendant also argued that Williams' testimony was improper because, as a mandated reporter, anything she asked A would have been in "preparation for the prosecutor's case." The court then asked defense counsel how Williams' actions as a mandated reporter rendered her ineligible to offer an opinion, to which defense counsel responded, "[w]ell, going back to, basically, she's not an expert witness, Your Honor, so she cannot . . . render an opinion." Finally, the defendant made one final objection on the ground that Williams might attempt to relate her testimony regarding the general phenomenon of delayed disclosure back to A's disclosure. None of the defendant's many stated bases for his objection, however, is consistent with the claim he now makes on appeal.

The court's response to the defendant's objections further supports our view that the defendant's claim is unpreserved, as the record indicates that the court did not understand the defendant to be objecting to Williams' prospective expert testimony because it exceeded the proper scope of the constancy of accusation doctrine. This is evidenced by the great lengths the court took to address the defendant's objection. The court first addressed the defendant's argument that the state improperly failed to disclose Williams as an expert, asking whether there was anything in the defendant's request for disclosure that would have required the state to "specifically delineate who [its] experts were going to be . . . ." Second, per the defendant's

request, the court cautioned Williams that she was not "in any way" to relate her testimony regarding delayed disclosure "to what [A] did or did not do," and confirmed with defense counsel that its instruction was satisfactory. Finally, the court noted that Williams' qualifications were "the core issue" with respect to the defendant's objection. Thus, it clearly explained why it believed that Williams was qualified to testify as an expert regarding delayed disclosure, citing her employment, experience, training, and education. At no point did the court indicate that it understood the defendant to be objecting to Williams' testimony on the ground that he now asserts on appeal. We therefore conclude that the defendant's claim is unpreserved and decline to review it.

B

The defendant next argues that the trial court improperly allowed Williams to testify as an expert because she was unqualified. Specifically, the defendant argues that Williams was unqualified because only fourteen children had disclosed to her that they had been sexually abused, she had never been deemed an expert in the field, and she had substantially less experience than witnesses who had testified as experts in other cases involving child victims of sexual abuse, citing *State* v. *Grenier*, 257 Conn. 797, 808, 778 A.2d 159 (2001) (testifying expert treated more than 900 victims of sexual abuse), and *State* v. *Spigarolo*, 210 Conn. 359, 376, 556 A.2d 112 (expert evaluated and treated 100 to 150 cases of child sexual abuse), cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). We disagree.

"The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 550, 757 A.2d 482 (2000). "To the extent the trial court makes factual findings to support its decision, we will accept those findings unless they are clearly improper. . . . If we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party." (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 123, 156 A.3d 506 (2017).

"Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Internal quotation marks

omitted.) Id., 123–24. In finding that a witness may properly be qualified as an expert, "[s]ome facts must be shown as a foundation for an expert's opinion, but there is no rule of law declaring the precise facts which must be proved before such an opinion may be received in evidence." (Internal quotation marks omitted.) *Marandino* v. *Prometheus Pharmacy*, 294 Conn. 564, 593, 986 A.2d 1023 (2010). An expert witness' skill or knowledge "may emanate from a myriad of sources, such as teaching, scholarly writings, study or practical experience." *Davis* v. *Margolis*, 215 Conn. 408, 417, 576 A.2d 489 (1990).

Moreover, "[i]t is not essential that an expert witness possess any particular credential, such as a license, in order to be qualified to testify, so long as his [or her] education or experience indicate that he [or she] has knowledge on a relevant subject significantly greater than that of persons lacking such education or experience." (Internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 62, 717 A.2d 724 (1998); see also *E & M Custom Homes, LLC* v. *Negron*, 140 Conn. App. 92, 110–11, 59 A.3d 262 (2013) (witness who lacked home improvement contractor's license, major contractor's license, and certificate of registration as new home construction contractor, but had completed approximately six new home constructions, was properly qualified as expert witness and allowed to testify about repairs needed to property at issue), appeal dismissed, 314 Conn. 519, 102 A.3d 707 (2014).

In the present case, the court determined that Williams was qualified to render an expert opinion "by reason of both her volunteer work and her paid employment, [and her] experience in dealing with . . . school-age students in disclosing sexual abuse . . . ." Williams' credentials support the court's conclusion. At the time of trial, Williams had both practical experience and the relevant educational background regarding the issue of delayed disclosure. She had studied characteristics of child victims of sexual abuse in obtaining her bachelor's and master's degrees. Moreover, Williams had received training through the department and other programs on how to handle, as a mandated reporter, a student's first disclosure of abuse. Furthermore, while employed as a school social worker and director of the youth group, Williams was told by approximately thirteen or fourteen students that they had been sexually abused. We therefore conclude that the court did not abuse its discretion in finding that Williams was qualified to testify as an expert on the topic of delayed disclosure.

III

Finally, the defendant claims that his conviction should be reversed because the prosecutor committed various improprieties at trial that deprived him of his

due process right to a fair trial. Specifically, the defendant argues that the prosecutor asked questions during cross-examination and made statements during closing argument that suggested that the defendant was required to provide an explanation as to why A and C would falsely accuse him of sexually abusing them. The defendant believes that the alleged improprieties diluted, distorted, and shifted the state's burden of proof, and were "tantamount to a direct statement that the defendant had the burden of proving or disproving the state's case." We are not persuaded that the prosecutor's conduct deprived the defendant of a fair trial.

The following additional facts and procedural history are relevant to the resolution of this claim. At trial, the defendant testified in his own defense. Specifically, the defendant testified that he never sexually abused A, either in concert with J or otherwise.

The defendant also denied that he ever sexually abused C. The defendant instead offered that he, J, and C had fallen asleep watching a movie on a couch in the defendant's living room, and that he overheard C complain to J that the defendant had rolled over and put his hand on her leg in his sleep.

The defendant further testified that, when he was unemployed, he began selling marijuana in order to support his family. On cross-examination, the defendant stated that J used to make marijuana deliveries for him on occasion, and that any incriminating statements in the letters he sent J from prison referred to his drug dealing operation. The following exchange then occurred between the prosecutor and the defendant:

"Q. Did you ever offer this as an explanation for the letters we have—

"A. I've never—

"Q. —prior to today?

"A. I've never been put in a position to do so; so, no.

"Q. *And yet, how exactly does this explain why* [*A*] *and* [*C*] *have made allegations of sexual abuse against you?*

"A. It doesn't explain. I never stated that it did explain that. I stated what I was asked what those letters referred to.

"Q. *Okay. So, you have no explanation for why* [*A*] *and* [*C*] *would make allegations of sexual abuse against you.*

"A. I didn't say that, either. You asked if I was using those letters to explain that, and I said no.

"Q. Okay, so you've taken—

"A. We're going in circles.

"Q. You've taken the [witness] stand this afternoon.

"A. Yes.

"Q. You're charged with very serious crimes.

"A. Yes.

"Q. *And you have offered no explanation in your testimony as to why these girls would come forward and make allegations against you.*

"A. As of yet, no; I have not.

"Q. *And when do you plan on doing that, sir?*

"A. I'm not the one asking questions, ma'am. You are, and he is." (Emphasis added.)

Defense counsel did not object to this line of questioning. The prosecutor then referenced specific parts of the defendant's letters to J and asked him to explain how they pertained to his supposed drug dealing. The defendant maintained that his letters did not constitute admissions of sexual assault and were consistent with his admission that he sold marijuana.

Thereafter, during the state's closing argument, the prosecutor again addressed the defendant's letters to J, stating: "If that isn't enough to prove beyond a reasonable doubt the charges against the defendant, I also ask you to consider the defendant's testimony.

"Ask . . . yourselves, how credible did he come across? How credible was he in light of his letters? How credible was he in light of the fact that his testimony was contrary to practically every other witness that testified?

"Despite the length to which he liked to talk about irrelevant information, isn't it interesting *that he couldn't offer a single explanation as to why* [A] *would make up these allegations against him?*

"*He couldn't offer a cogent, reasonable explanation for why* [J] *would voluntarily tell the police that she was involved in sexual misconduct with him.*

"*He couldn't explain why* [C] *would make accusations against him. He couldn't explain the letters in any meaningful, credible way.*

"Given all that he did have to say over the course of two hours, he didn't offer a shred of testimony that made sense. He couldn't explain how not once did he accuse his wife of lying in his letters.

"He accused her of minimizing her involvement at times, but never once did he tell her she was lying. On the contrary, he yells at her in one breath to stop talking to the police and [the department], and in the next, he tells her that he loves her and hopes that they can live happily ever after.

"And yet, he wants us to believe that all of these letters are really about some drug dealing operation

that no one seems to know anything about. Not a shred of evidence to suggest he's being investigated for selling drugs, nor is he charged with that offense.

"It's just a convenient, if not very plausible, explanation for what he was hiding from the police and why he kept telling his wife not to talk to him. An explanation, sure, but not a very good one." (Emphasis added.)

Again, defense counsel did not object to the prosecutor's comments. Furthermore, the prosecutor stated in her closing argument that "[t]he judge will instruct you that . . . you must determine each element of each of the crimes; and . . . in order to find the defendant guilty of a particular charge or count, you must find . . . each of the elements to be proven beyond a reasonable doubt." The prosecutor then addressed the crimes of sexual assault in the first degree and risk of injury to a child and explained what the state must have proven with respect to each element of those crimes in order for the jury to find the defendant guilty.

In addition, the court instructed the jury regarding the presumption of innocence and stated multiple times that the state bore the burden of proving the elements of each crime beyond a reasonable doubt. The court also provided the jury with extensive instructions regarding the definition of proof beyond a reasonable doubt.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether the prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial." (Internal quotation marks omitted.) Id.

Although the defendant did not object at trial to either the prosecutor's questions on cross-examination or her comments during closing argument, it is unnecessary for him to seek review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[8] See *State* v. *Stevenson*, 269

Conn. 563, 572–75, 849 A.2d 626 (2004). "The reason for this is that . . . appellate review of claims of prosecutorial [impropriety involves] a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by [our Supreme Court] in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)." *State* v. *Stevenson*, supra, 573. "The consideration of the fairness of the entire trial through the *Williams* factors duplicates, and, thus makes superfluous, a separate application of the *Golding* test." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 35, 100 A.3d 779 (2014).

Even if we assume without deciding,[9] however, that the prosecutor's questions on cross-examination and comments during closing argument constituted impropriety,[10] we are not persuaded that the defendant was deprived of his due process right to a fair trial. "When a defendant demonstrates improper questions or remarks by the prosecutor during the course of trial, the defendant bears the burden of showing that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . This assessment is made through application of the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540 . . . . These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Albino*, 312 Conn. 763, 790–91, 97 A.3d 478 (2014). Applying these factors to the questions and statements at issue in the present case, we conclude that the defendant was not denied due process of law.

At the outset, we acknowledge that two of the *Williams* factors tend to support the defendant's claim. First, the potential impropriety was not invited by the defendant. The state concedes as much. Second, the potential impropriety concerned a critical issue in the case—whether A and C had a motive to lie about the defendant's sexual abuse of them. When considered in context with the remaining four factors, however, it is clear that the potential impropriety did not deprive the defendant of a fair trial.

Regarding the severity of the potential impropriety, it is significant that defense counsel did not object to either the prosecutor's line of questioning on cross-

examination or her comments during closing argument. Our appellate courts have often given "considerable weight to the fact that defense counsel did not object to . . . [the alleged] improprieties" and considered it "a strong indicator that counsel did not perceive them as seriously jeopardizing the defendant's fair trial rights." *State* v. *Jones*, 320 Conn. 22, 38, 128 A.3d 431 (2015). Indeed, "counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . [necessary] . . . [to] clearly depriv[e] . . . the defendant of a fair trial . . . ." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 484, 832 A.2d 626 (2003). Thus, the defendant's failure to object in both instances suggests that any impropriety was not severe.

Furthermore, the severity of the impropriety is often "counterbalanced in part by the third *Williams* factor, namely, the frequency of the [impropriety] . . . ." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 289, 973 A.2d 1207 (2009). The defendant argues that the potential impropriety was "somewhat frequent" and not "just one brief isolated comment." The defendant takes issue, however, only with three questions contained in thirty-five transcribed pages of cross-examination, and a few isolated statements contained in the prosecutor's entire closing argument. "Improper statements that are minor and isolated will generally not taint the overall fairness of an entire trial." (Internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 17, 124 A.3d 871 (2015). Thus, while the potential impropriety does not encompass merely one question or statement, it certainly cannot be characterized as "frequent" when considered in the context of a lengthy cross-examination and closing argument. See *State* v. *Payne*, 303 Conn. 538, 567, 34 A.3d 370 (2012) (three improper statements made by prosecutor during lengthy closing argument were not frequent); see also *State* v. *Salamon*, 287 Conn. 509, 552–55, 567, 949 A.2d 1092 (2008) (prosecutor's improper statements during closing and rebuttal arguments that encouraged jury to speculate that kidnapping case also involved uncharged attempted sexual assault were not particularly frequent when viewed in context of entire trial, which spanned several days).

With respect to the strength of the curative measures adapted, although it is true that "a general instruction does not have the same curative effect as a charge directed at a specific impropriety"; *State* v. *Warholic*, 278 Conn. 354, 401, 897 A.2d 569 (2006); "the defendant, by failing to bring [the improper comment] to the attention of the trial court, bears much of the responsibility for the fact that [this] claimed impropriet[y] went uncured." (Internal quotation marks omitted.) Id., 402. Furthermore, even absent a specific curative instruc-

tion, the court's general written and oral instructions, in which it repeatedly stated that the prosecution had the burden of proving the elements of each crime charged in the information beyond a reasonable doubt and clearly explained the concept of the presumption of innocence, sufficiently cured any potential confusion by the jury. See *State* v. *Albino*, supra, 312 Conn. 792 (although defendant's "failure to object or to ask for such measures to be taken deprived the court of an opportunity to address the improprieties with any specificity," court's general instructions nonetheless likely mitigated effect of improprieties).

We now turn to the last *Williams* factor, which assesses the overall strength of the state's case. Here, the state's case was quite strong. To begin, A's testimony was directly corroborated in part by J, who was an eyewitness and, at times, a participant in the defendant's sexual abuse of A. J corroborated A's testimony that she had performed fellatio on the defendant in front of A and asked A to join in. J also corroborated A's testimony that the defendant had brought A to his bedroom on at least one occasion, and, on that occasion, J fondled A's breasts at the request of the defendant. A's allegations were further corroborated by C's testimony concerning uncharged misconduct of the defendant. The incident C described at trial—during which the defendant repeatedly tried to put his hands down her pants while she was asleep on the couch in his living room—was very similar to A's testimony that the defendant would often touch her when she was asleep in her bed or on the couch in the living room. Moreover, C, like A, testified that she believed the defendant had secretly taken photographs or videos of her. C's testimony regarding the defendant's uncharged misconduct was properly introduced as propensity evidence. Therefore, the jury was free to conclude that because the defendant had sexually abused C, it was more likely that he had committed the sexual misconduct for which he was being tried. See Conn. Code Evid. § 4-5 (b).

Finally, A's allegations were corroborated by the defendant's own written statements, contained in his letters to J. Specifically, the defendant wrote: (1) "they want me to confirm that you gave me a BJ in front of your sister cause you said you did I say nothing if I did you would be in jail to[o]," (2) "not only did [J] know what was going on but [she] helped and supported in it," (3) on "many nights [J] . . . arranged so the older kids weren't home," and (4) that "had [J] said nothing they couldn't have made the charges stick but [she] sealed that deal." Thus, the defendant's own statements supported A's allegations that he had sexually abused her[11] and even referenced a specific instance of abuse testified to by J. Therefore, considering that A's testimony was corroborated extensively, we conclude that the state's case was strong despite the lack of physi-

cal evidence.[12]

In sum, we conclude that (1) the potential impropriety was neither severe nor frequent, (2) the court's instructions were sufficient to correct any confusion the jury may have had regarding the state's burden of proof, and (3) the state's case was strong overall. We therefore conclude that the questions and statements made by the prosecutor and challenged by the defendant on appeal did not deprive him of his due process right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[1] For ease of discussion, we address the defendant's claims in a different order than that in which they appear in his brief.

[2] The defendant also had a son from a previous marriage, who occasionally spent the weekend at the defendant's apartment.

[3] C, the victim of that abuse, testified for the state in the present case.

[4] J was also arrested on charges stemming from the abuse of her sister after partially admitting to her own involvement. She later pleaded guilty and was convicted of conspiracy to commit sexual assault in the first degree, conspiracy to commit risk of injury to a child, risk of injury to a child, and sexual assault in the fourth degree.

[5] The defendant also argues that the court's limiting instruction to the jury regarding uncharged misconduct evidence was improper because it was given immediately after C's testimony, rather than prior to it. Furthermore, the defendant argues that the court's instructions in its final charge "would have led the jury to believe that C's claims had been proven, resulting in more prejudice to the defendant." Because the defendant did not object at trial to the court's instruction regarding uncharged misconduct evidence either immediately after C's testimony or during the court's final charge, and does not seek review under *Golding*; see *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015); or the plain error doctrine; Practice Book § 60-5; his claim is unpreserved. We therefore decline to review it.

[6] The defendant argues that the present case is similar to *State* v. *Gupta*, 297 Conn. 211, 998 A.2d 1085 (2010). In that case, our Supreme Court concluded that the trial court abused its discretion in consolidating three cases against the defendant for trial because the evidence in the case involving one of the complainants was not cross admissible in the other two cases under Conn. Code Evid. § 4-5 (b) and *DeJesus*. Id., 226.

Specifically, the court found that the sexual misconduct alleged by one of the complainants was not sufficiently similar to the misconduct alleged by the complaining witnesses in the other two cases, because it was more severe. Id. All three alleged that the defendant, a physician, had molested them during their respective medical examinations with him. Id., 226–27. The first complainant alleged that the defendant had kissed her on her cheeks, remarked that her breasts were "soft and beautiful," pinched her nipples, tapped her pelvic bone and told her that she was "so hot," firmly massaged her breasts with his hands, asked if he could kiss her breasts, and proceeded to put his mouth on her breasts. (Internal quotation marks omitted.) Id. The other two complainants, however, alleged only that the defendant had improperly touched their breasts. Id., 226.

*Gupta*, however, is clearly distinguishable from the present case. In *Gupta*, the defendant's conduct toward two of the complainants did not escalate beyond inappropriate touching. The first and only time he molested the first complainant, however, the abuse was far more severe and included tapping her pelvic bone, putting his mouth on her breasts, and biting her in a sexual manner. Thus, the defendant's initial advances toward the other two complainants were dissimilar to his initial advance toward the first complainant. In the present case, unlike in *Gupta*, the defendant's initial advances toward C and A were nearly identical. *Gupta* therefore does not support the defendant's claim.

[7] The defendant argues in his reply brief that the state failed to give adequate notice that Williams would testify as an expert at trial. At oral argument, however, the defendant conceded that he never raised this claim in his principal brief on appeal. Thus, we decline to review the defendant's claim of inadequate notice. See *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997) ("[i]t is a well established principle that arguments can not be raised for the first time in a reply brief" [internal quotation marks omitted]). The defendant also claims that the court improperly permitted Dawn Jackle, a department social worker who was assigned to the case, to testify as an expert because she was unqualified. Because the defendant did not object to Jackle's testimony at trial, his claim is unpreserved. Furthermore, the defendant's postverdict motion for a new trial, in which he argued for the first time that Jackle did not properly qualify as an expert and that her testimony was more prejudicial than probative, was likewise insufficient to preserve his claim for review. See *State* v. *Paris*, 63 Conn. App. 284, 294–95, 775 A.2d 994 (In refusing to review an evidentiary claim that was raised for the first time in a postverdict motion for a new trial, this stated, "[w]e are not persuaded that evidentiary claims, not made at trial, can be preserved for appeal by raising them in a motion for a new trial after a guilty verdict. The problems inherent in allowing counsel to wait until after an adverse verdict to raise such objections to evidence are too obvious to warrant discussion."), cert. denied, 257 Conn. 909, 782 A.2d 135 (2001). We therefore decline to review the defendant's claim with respect to Jackle's qualifications.

[8] See *State* v. *Golding*, supra, 213 Conn. 239–40 (modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 [2015]).

[9] Although ordinarily we would first analyze whether the prosecutor's actions were improper, we have on occasion considered the *Williams* factors after assuming error if we are convinced that, despite the potential impropriety, it was not so egregious as to violate the defendant's due process rights. See *State* v. *Ciullo*, supra, 314 Conn. 57; see also *State* v. *Fernandez*, 169 Conn. App. 855, 869, 153 A.3d 53 (2016).

[10] Regarding the first prong of the analysis, i.e., whether an impropriety occurred, we find that the prosecutor's questions on cross-examination and comments during closing argument straddle the line between proper and improper. Although the state was entitled to argue that there did not appear to be any reason or motive for A or C to concoct a story that the defendant had sexually assaulted them, the form of the prosecutor's questions and the manner in which she presented a portion of her closing argument risked confusing the jury as to the appropriate burden of proof because they suggested that the state was entitled to a guilty verdict in the absence of the defendant coming forward with evidence, or at least a theory, as to the witnesses' motives to fabricate their claims.

[11] We do not find persuasive the defendant's explanation that his letters referred to a drug dealing operation, as his testimony was not supported by any other evidence at trial.

[12] The defendant argues that "[t]he case against the defendant cannot be considered strong . . . [because] no physical evidence corroborated her claims." Because the last instance of abuse occurred five years before A's disclosure, however, it was highly improbable that any physical evidence would still exist at that time and, in fact, none did. Furthermore, A's allegations were corroborated extensively in other ways. Therefore, the defendant is incorrect that the lack of physical evidence rendered the state's case weak. See *State* v. *Felix R.*, supra, 319 Conn. 18–19 (state's case was not weak due to lack of conclusive physical evidence of sexual assault considering other corroborating evidence introduced at trial, such as that abuser bought victim pregnancy test and morning after pills, as well as testimony of social workers and police officers who investigated case).