******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# IN RE JACOB W. ET AL.*

## (SC 20063)

Palmer, McDonald, D'Auria, Mullins, Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

Pursuant to statute (§ 45a-717 [g] [1] and [2] [C]), a court may approve a petition terminating parental rights if it finds, upon clear and convincing evidence, that termination is in the best interests of the child, there is no ongoing parent-child relationship, and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child.

The respondent father appealed from the judgment of the Appellate Court, which reversed the trial court's judgments denying petitions for the termination of his parental rights with respect to his three minor children, J, N and C, filed by the petitioner, the children's grandmother. The respondent, who had been married to M, the mother of the children and the petitioner's daughter, was arrested and charged with multiple crimes as a result of his repeated sexual assault of A, the petitioner's minor child and M's younger sister. M was charged with conspiracy in connection with those sexual assaults. After the respondent and M were incarcerated, the petitioner and her husband were appointed guardians of the children. In addition, a standing criminal protective order was issued, barring the respondent from contacting A and others with whom contact would be likely to cause annoyance or alarm to A. At the time the protective order was issued, A lived in the same home with the children and the petitioner. The respondent subsequently was convicted of multiple counts of sexual assault, among other crimes, and was sentenced to a term of twenty-nine years of incarceration. The petitioner sought to terminate the parental rights of both the respondent and M. M consented to termination, and the case proceeded against the respondent. The petitioner alleged as a ground for termination under § 45a-717 (g) (2) (C) that there was no ongoing parent-child relationship between the respondent and the children. The trial court denied the petitions, concluding, inter alia, that the petitioner had failed to prove that ground by clear and convincing evidence. In reaching its conclusion, the trial court relied on the respondent's efforts while he was incarcerated to maintain contact with the children in light of the protective order, including his request that the grandparents provide him with updates concerning the children. The trial court found that the grandparents had interfered with the respondent's efforts to maintain a relationship with the children, citing the grandparents' failure to provide the respondent with any updates about the children and their false explanation to the children that the respondent was incarcerated for a domestic violence incident involving M that the children previously had witnessed. In reversing the trial court's judgments and remanding the case for a new termination hearing, the Appellate Court concluded that the trial court applied an incorrect legal test in determining that the petitioner had failed to prove the lack of an ongoing parent-child relationship. On the granting of certification, the respondent appealed to this court. *Held*:

1. The Appellate Court properly reversed the trial court's judgments on the ground that the trial court applied an incorrect legal test in determining that the petitioner had failed to prove the lack of an ongoing parent-child relationship by clear and convincing evidence pursuant to § 45a-717 (g) (2) (C): this court clarified that, when a custodial parent or guardian seeks to terminate the parental rights of a noncustodial parent, and that parent or guardian has engaged in conduct that inevitably leads to the noncustodial parent's lack of an ongoing parent-child relationship, the custodial parent or guardian cannot rely on the lack of such a relationship to terminate the noncustodial parent's rights, and, except in cases involving infant children, the existence of an ongoing parent-child relationship is determined by looking at the present feelings or memories of the child toward the respondent parent rather than by the respondent parent's conduct in maintaining that relationship; further-

more, the trial court failed to determine that the grandparents' conduct inevitably led to the lack of an ongoing parent-child relationship between the respondent and the children, as it failed to explain how the grandparents' failure to update the respondent about the children or how the grandparents' failure to explain the real reason for the respondent's incarceration would have affected the children's feelings toward the respondent, and, in the absence of such a determination, the trial court could not conclude that the petitioner could not rely on the lack of an ongoing parent-child relationship as a basis for termination; moreover, the court, in denying the petitions, improperly focused on the respondent's conduct rather than focusing on whether the children had present memories or feelings for the respondent that were positive in nature.

2. The respondent could not prevail on his claim that, even if the trial court had applied an incorrect legal test in concluding that the petitioner had failed to prove the lack of an ongoing parent-child relationship, this court must reverse the Appellate Court's judgment on the ground that the trial court also determined that the petitioner had failed to prove by clear and convincing evidence that allowing the respondent additional time to reestablish the parent-child relationship would be detrimental to the best interests of the children, as that determination was predicated on a clearly erroneous factual finding that there was no evidence presented with respect to that issue; the trial court's finding that there was no evidence presented that would support a claim that additional time to reestablish such a relationship would be detrimental to the children's best interests could not be reconciled with the record, which revealed the existence of such evidence, including evidence regarding J's and N's negative feelings toward the respondent, the fact that C had little or no memory of the respondent, the preclusive effect that the protective order had on the respondent's ability to maintain a relationship with the children, and the fact that the Department of Children and Families, and the guardian ad litem and attorney for the minor children recommended termination of the respondent's parental rights.

(*Three justices dissenting in one opinion*)

Argued September 11, 2018—officially released February 15, 2019**

*Procedural History*

Petitions to terminate the respondents' parental rights with respect to their minor children, brought to the Probate Court for the district of Ellington and transferred to the Superior Court in the judicial district of Tolland, Juvenile Matters at Rockville, where the respondent mother consented to termination; thereafter, the case was tried to the court, *Westbrook, J.*; judgments denying the petitions as to the respondent father, from which the petitioner appealed to the Appellate Court, *DiPentima, C. J.*, and *Prescott* and *Mihalakos, Js.*, which reversed the trial court's judgments and remanded the case to that court for a new trial, and the respondent father, on the granting of certification, appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, assigned counsel, with whom, on the brief, was *Amir Shaikh*, assigned counsel, for the appellant (respondent father).

*James P. Sexton*, assigned counsel, with whom were *Matthew C. Eagan*, assigned counsel, and, on the brief, *Megan L. Wade*, assigned counsel, for the appellee (petitioner).

*Opinion*

KAHN, J. This certified appeal requires us to clarify the circumstances under which a petitioner is precluded from relying on an alleged lack of an ongoing parent-child relationship as a basis for terminating a noncustodial parent's rights.[1] The respondent father, Daniel W., appeals from the judgment of the Appellate Court, which reversed the judgments of the trial court denying the petitions for termination of the respondent's parental rights with respect to his three minor children and remanded the case for a new trial. *In re Jacob W.*, 178 Conn. App. 195, 219, 172 A.3d 1274 (2017). The respondent contends that the Appellate Court improperly concluded that the trial court had applied an incorrect legal test in determining that the petitioner,[2] the maternal grandmother of the minor children, had failed to prove the nonexistence of an ongoing parent-child relationship by clear and convincing evidence. See id., 207. The respondent claims that, in so concluding, the Appellate Court incorrectly reasoned that the trial court improperly rested its analysis on inconsistent propositions.[3] The respondent further contends that, even if the trial court applied an incorrect legal test to determine that the petitioner had failed to prove the lack of an ongoing parent-child relationship, the judgment of the trial court may be upheld on the basis that the court also found that the petitioner failed to prove that allowing further time for a parent-child relationship to develop would be detrimental to the best interests of the children. Although we agree with the Appellate Court that the trial court applied an incorrect legal test, our conclusion rests on different grounds. Specifically, we conclude that the trial court incorrectly concluded that, under the facts of the present case, it was required to depart from the usual test to determine whether a petitioner has established a lack of an ongoing parent-child relationship. As we explain in this opinion, the facts as found by the trial court did not support a departure from the ordinary inquiry and instead required the court to base its decision on the present feelings and memories of the children rather than the actions of the respondent. We further conclude that the trial court's determination that the petitioner failed to prove that allowing further time for a parent-child relationship to develop would be detrimental to the best interests of the children was predicated on a clearly erroneous factual finding. Accordingly, we affirm the judgment of the Appellate Court.

The record reveals the following relevant facts, found by the trial court or otherwise undisputed, and procedural history. The respondent and his then wife, J, had three children, Jacob, born in 2006, N, born in 2008, and C, born in 2012. Jacob, N and C have been living in the home of their maternal grandparents since May, 2012, when the respondent, J and the children moved

in with them. When the grandfather asked the respondent to leave in October, 2012, he moved in with his mother, while J and the children remained with the grandparents. The respondent continued to have contact with the children until he was arrested on April 2, 2014, and charged with multiple counts of sexual assault of a minor. On July 3, 2014, J also was arrested and charged with conspiracy in connection with the same set of incidents that gave rise to the respondent's arrest.

As a result of the criminal charges against him, the respondent was convicted, following a jury trial, of six counts of risk of injury to a child in violation of General Statutes (Rev. to 2013) § 53-21 (a) (2), five counts of sexual assault in the first degree in violation of General Statutes (Rev. to 2013) § 53a-70 (a) (2), one count of attempt to commit sexual assault in the first degree in violation of § 53a-70 (a) (2) and General Statutes § 53a-49, one count of sexual assault in the fourth degree in violation of General Statutes (Rev. to 2013) § 53a-73a (a) (1) (A), one count of risk of injury to a child in violation of § 53-21 (a) (1), one count of conspiracy to commit risk of injury to a child in violation of § 53-21 (a) (2) and General Statutes § 53a-48, and one count of attempt to commit risk of injury to a child in violation of §§ 53-21 (a) (2) and 53a-49. The respondent was sentenced to a total effective term of twenty-nine years of incarceration, followed by sixteen years of special parole. See *State* v. *Daniel W.*, 180 Conn. App. 76, 79, 84, 182 A.3d 665, cert. denied, 328 Conn. 929, 182 A.3d 638 (2018).

The minor that the respondent was convicted of assaulting was J's younger sister, A, the children's aunt. At the time of the respondent's arrest, a criminal protective order was put in place preventing the respondent from contacting A "in any manner, including by written, electronic or telephone contact . . . ." The order also barred the respondent from contacting A's "home, workplace or others with whom the contact would be likely to cause annoyance or alarm to [A]." At the respondent's January, 2016 sentencing hearing, the court issued a standing criminal protective order to remain in effect until September 6, 2068. During the sentencing hearing, upon the request of the respondent's counsel for clarification of the scope of the order, the court explained that the standing protective order, which was identical to the one already in place, barred the respondent from having contact not only with A, but also with her immediate family, including her parents, the children's grandparents, but not the respondent's children themselves. Because the children lived with A in their grandparents' home, the protective order had the practical effect of prohibiting the respondent from contacting the children's home and the children's guardians. During the sentencing hearing, the respondent did not request any modification to the scope of the standing criminal protective order.

On the day that J was arrested, the grandparents petitioned the Probate Court for the district of Ellington for immediate temporary custody of the children on the basis that both parents were now incarcerated. The court granted the petitions and, five months later, granted the grandparents' petitions for the removal of the parents and the appointment of the grandparents as the guardians of the children, to which both the respondent and J consented. Approximately one year after the grandparents were appointed guardians of the children, the petitioner filed the petitions to terminate the parental rights of both the respondent and J. The respondent indicated through counsel his intent to contest the termination, and, on that basis, the guardian ad litem for the children filed a motion pursuant to General Statutes § 45a-715 (g) to transfer the case from the Probate Court to the Superior Court, which the court granted. J subsequently consented to the termination of her parental rights, and the case proceeded against the respondent alone.

The original petitions alleged that the children had been denied the care, guidance, or control necessary for their physical, educational, moral, or emotional well-being, by reason of acts of parental commission or omission. In an amendment to the petitions filed on November 16, 2016, the petitioner withdrew that allegation and instead alleged abandonment and the lack of an ongoing parent-child relationship as grounds for termination.

Following a trial, the court denied the petitions. In its memorandum of decision, the trial court first turned to the question of whether the petitioner had proven that the respondent abandoned the children pursuant to General Statutes § 45a-717 (g) (2) (A). In concluding that she had not, the court relied on the actions undertaken by the respondent to maintain contact with the children. Prior to the respondent's incarceration, the court found that he provided for the children financially, participated in their daily activities and had hosted birthday parties for the children. The court evaluated the respondent's efforts to maintain contact with the children during his incarceration in light of the protective order, which greatly limited his ability to contact them. The court observed that, despite that obstacle, the respondent had made some efforts to maintain contact with the children. The court noted that the respondent had requested assistance from the Department of Children and Families (department) in facilitating visitation with the children[4] and, in 2014, participated in a program that sends Christmas gifts to children of incarcerated parents. The trial court also found that, in 2014, during a Probate Court proceeding, the respondent requested that the grandparents provide him with updates on the children. Relying on these facts, the court concluded that the petitioner had failed to prove by clear and

convincing evidence that the respondent had abandoned the children.

The court next turned to the petitioner's claim that there was no ongoing parent-child relationship pursuant to § 45a-717 (g) (2) (C). The court began its analysis by recognizing that § 45a-717 (g) (2) (C) requires a two part inquiry. Turning to the first part of the inquiry—whether the petitioner had established no ongoing parent-child relationship by clear and convincing evidence—the court cited to the same facts it had relied on to conclude that the petitioner had failed to prove abandonment, that is, the court looked to the respondent's conduct. Although the court had made findings regarding the children's negative feelings toward or lack of memory of the respondent, it did not consider the feelings or memories of the children in resolving the first part of the inquiry under § 45a-717 (g) (2) (C).

In its analysis, the court cited to an Appellate Court decision, *In re Carla C.*, 167 Conn. App. 248, 251, 143 A.3d 677 (2016), which held that a custodial parent or guardian who has "interfered [with a noncustodial parent's] visitation and other efforts" cannot terminate the noncustodial parent's rights on the basis of an alleged lack of an ongoing parent-child relationship. The trial court found that the grandparents had interfered with the respondent's efforts to maintain a relationship with his children. In support of that finding, the court cited to the failure of the grandparents to provide updates to the respondent concerning the children. In reaching its finding of interference, the trial court also relied on evidence that the grandparents had not told the children the truth about why the respondent was incarcerated. Specifically, the grandparents initially had not provided the children with any explanation for the respondent's absence, and, when they eventually told the children that the respondent was incarcerated, rather than tell them that he had sexually assaulted their aunt, the grandparents told the children he was in prison for beating J.

As a consequence of its finding that the grandparents had interfered with the respondent's efforts to maintain a relationship with the children, the trial court did not conclude that the petitioner was barred from relying on the ground of no ongoing parent-child relationship as a basis for termination. Instead, the trial court suggested that the combination of two of its findings—namely, that the grandparents had interfered and that the respondent had made efforts to maintain contact with the children—supported the conclusion that the petitioner had not proven by clear and convincing evidence a lack of an ongoing parent-child relationship.

The court next turned to the second part of the inquiry under § 45a-717 (g) (2) (C)—whether the petitioner had proven by clear and convincing evidence that allowing the respondent additional time to reestablish the parent-

child relationship would be detrimental to the best interests of the children. The court's entire discussion of this prong encompassed two sentences: "There was no evidence presented by the petitioner at trial that would support a claim that additional time to reestablish a relationship with the children would be detrimental. The statements of dislike by very young children with false information about their father does not establish by clear and convincing evidence that reestablishing a relationship would be detrimental."

The petitioner appealed from the trial court's judgments denying the petitions to the Appellate Court. That court concluded that the trial court had applied an incorrect legal test in denying the petitions. In so concluding, the court focused on inconsistencies that it had discerned in the trial court's memorandum of decision. See *In re Jacob W.*, supra, 178 Conn. App. 198–99. The Appellate Court identified two inconsistencies in the trial court's analysis: (1) a conclusion that an ongoing parent-child relationship existed and simultaneously did not exist because the grandparents' "unreasonable interference inevitably prevented the respondent from maintaining an ongoing parent-child relationship"; id., 211; and (2) a finding "both that the grandparents' unreasonable conduct constituted interference and that there was no evidence of unreasonable interference by any person." Id., 215–16.

I

We first consider whether the Appellate Court properly concluded that the trial court applied an incorrect legal test to determine whether the petitioner had proven by clear and convincing evidence the lack of an ongoing parent-child relationship. Because that question presents a question of law, our review is plenary. See *In re Egypt E.*, 327 Conn. 506, 525–26, 175 A.3d 21 (setting forth applicable standards of review for subordinate factual findings [clear error], ultimate conclusion that ground for termination has been proven [evidentiary sufficiency] and legal questions [plenary]), cert. denied sub nom. *Morsy E.* v. *Commissioner, Dept. of Children & Families*, U.S. , 139 S. Ct. 88, 202 L. Ed. 2d 27 (2018).

Section 45a-717 (g) provides in relevant part: "At the adjourned hearing or at the initial hearing where no investigation and report has been requested, the court may approve a petition terminating the parental rights . . . if it finds, upon clear and convincing evidence, that (1) the termination is in the best interest of the child, and (2) . . . (C) there is no ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental

to the best interests of the child . . . ." We have explained that the inquiry under § 45a-717 (g) (2) (C) is a two step process. First, the court must determine whether the petitioner has proven the lack of an ongoing parent-child relationship. Only if the court answers that question in the affirmative may it turn to the second part of the inquiry, namely, "whether allowance of further time for the establishment or reestablishment of the relationship would be contrary to the child's best interests." (Emphasis omitted.) *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 675–76, 420 A.2d 875 (1979); see id. ("[t]he 'best interests' standard . . . comes into play only if it has been determined that no ongoing parent-child relationship exists, *in order to decide whether allowance of further time for the establishment or reestablishment of the relationship would be contrary to the child's best interests*" [emphasis altered]); see also *In re Carla C.*, supra, 167 Conn. App. 265 ("[t]he best interest standard . . . does not become relevant until *after* it has been determined that no parent-child relationship exists" [emphasis added; internal quotation marks omitted]); *In re Michael M.*, 29 Conn. App. 112, 128, 614 A.2d 832 (1992) (same); *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 480, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984) (same).

In interpreting the parameters of § 45a-717 (g) (2) (C), we must be mindful of what is at stake. "[T]he termination of parental rights is defined, in [what is now General Statutes § 45a-707 (8)], as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . It is, accordingly, a most serious and sensitive judicial action. . . . Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) . . . ." (Citation omitted; internal quotation marks omitted.) *In re Valerie D.*, 223 Conn. 492, 514, 613 A.2d 748 (1992).

Moreover, because the respondent is incarcerated, we emphasize that "the fact of incarceration, in and of itself, cannot be the basis for a termination of parental rights. . . . At the same time, a court properly may take into consideration the inevitable effects of incarceration on an individual's ability to assume his or her role as a parent. See, e.g., *In re Katia M.*, 124 Conn. App. 650, 661, 6 A.3d 86 (parent's unavailability, due to incarceration, is an obstacle to reunification), cert. denied, 299 Conn. 920, 10 A.3d 1051 (2010); see also *In re Gwynne P.*, 346 Ill. App. 3d 584, 597–98, 805 N.E.2d 329 (2004) (parent's repeated incarceration may lead

to diminished capacity to provide financial, physical, and emotional support for . . . child . . . ), aff'd, 215 Ill. 2d 340, 830 N.E.2d 508 (2005). Extended incarceration severely hinders the department's ability to offer services and the parent's ability to make and demonstrate the changes that would enable reunification of the family. . . . This is particularly the case when a parent has been incarcerated for much or all of his or her child's life and, as a result, the normal parent-child bond that develops from regular contact instead is weak or absent." (Citations omitted; internal quotation marks omitted.) *In re Elvin G.*, 310 Conn. 485, 514–15, 78 A.3d 797 (2013).

The lack of an ongoing parent-child relationship is a " 'no fault' " statutory ground for the termination of parental rights. *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 669. This court has explained that the ground of " 'no ongoing parent-child relationship' " for the termination of parental rights contemplates "a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." Id., 670. The ultimate question is whether the child has "some present memories or feelings for the natural parent that are positive in nature." (Internal quotation marks omitted.) *In re Jessica M.*, 217 Conn. 459, 469, 586 A.2d 597 (1991).

In its interpretation of the language of § 45a-717 (g) (2) (C), this court has been careful to avoid placing "insurmountable burden[s]" on noncustodial parents. Id., 467. Because of that concern, we have explicitly rejected a literal interpretation of the statute, which defines the relationship as one "that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child . . . ." General Statutes § 45a-717 (g) (2) (C). "[D]ay-to-day absence alone," we clarified, is insufficient to support a finding of no ongoing parent-child relationship. *In re Jessica M.*, supra, 217 Conn. 470. We also have rejected the notion that termination may be predicated on the lack of a "*meaningful* relationship," explaining that the statute "requires that there be *no* relationship." (Emphasis added.) *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 675.

We have emphasized that, as to noncustodial parents, "[t]he evidence regarding the nature of the [parent's] relationship with [his] child at the time of the termination hearing must be reviewed in the light of the circumstances under which visitation had been permitted." *In re Jessica M.*, supra, 217 Conn. 473. For instance, in *In re Jessica M.*, we concluded that there was insufficient evidence to prove a lack of an ongoing parent-child relationship between a noncustodial mother and her

child. Id., 472–73. Although that conclusion was based primarily on the fact that the child had "present memories or feelings for her mother [and] that at least some aspects of [those] memories and feelings [were] positive"; id., 474–75; we also took into account the circumstances under which visitation had been permitted. Specifically, we considered it relevant that the child's legal guardians, who had petitioned for termination of the mother's parental rights, had placed restrictions on her ability to visit the child during the duration of their guardianship. Id., 472–73.

We later applied these principles to conclude that, when the department engages in conduct that inevitably leads to a noncustodial parent's lack of an ongoing parent-child relationship, the department cannot rely on the lack of that relationship to terminate the noncustodial parent's rights. *In re Valerie D.*, supra, 223 Conn. 531, 535. In other words, we did not hold that the consequence of such conduct was that the test for determining whether there was an ongoing parent-child relationship was altered. Instead, we held that, as a result of its conduct, the department was precluded from relying on that ground as a basis for termination. Id., 532. In *In re Valerie D.*, the department was granted temporary custody of the child within days after she was born, primarily because the mother, who had used cocaine throughout her pregnancy, had injected herself with cocaine hours prior to delivery, as a result of which the child was born addicted to cocaine and suffered from withdrawal. Id., 499–504. Soon after it had obtained temporary custody, the department filed coterminous petitions for custody and termination of the parental rights of the mother. Id., 499–503. The amended petition for termination relied, inter alia, on the ground that there was no ongoing parent-child relationship. Id., 504. As a result of the department's success in obtaining custody of the child, from the time that the department was granted temporary custody a few days after the child's birth to the date of the termination hearing three and one-half months later, the child remained in foster care. Id., 527. During that time, primarily due to the placement of the child in a foster home, the mother had been able to visit the child only eight times. Id., 528.

Two factors led this court to conclude that, under the circumstances of that case, termination of the mother's parental rights could not be permitted on the basis that there was no ongoing parent-child relationship. Id., 532. First, the court observed that, at the time of the termination hearing, the child was not yet four months old. Id., 527. The court recognized that the usual test for an ongoing parent-child relationship is not appropriate when the child is "virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence." Id., 532. Under those circumstances, the court reasoned, it simply makes no

sense to inquire as to whether an infant has some present memories or feelings for the natural parent that are positive in nature. Id. Instead, "the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent." Id.

Second, even assuming that the department had established that the mother lacked such positive feelings, the court concluded that principles of statutory construction precluded the department from gaining and maintaining "custody of a newborn infant pursuant to [General Statutes] § 46b-129 under circumstances . . . that will lead almost inevitably" to termination on the basis of a lack of an ongoing parent-child relationship. Id., 532 n.34, 533. The statutory problem, the court explained, stemmed from the different standards governing custody and termination. Under the facts of the case, "a factual predicate for custody, established by the lesser standard of a preponderance of the evidence, led inexorably, for all practical purposes, to the factual predicate for termination required to be established by the higher standard of clear and convincing evidence." Id., 533–34. The problem highlighted by the court in *In re Valerie D.* was that it was the very party who petitioned to terminate the mother's parental rights—the department—whose conduct inevitably had led to the lack of a parent-child relationship. That is, by filing the petitions coterminously in the case of a child who was so young, the department virtually ensured that, upon the grant of custody at the lower standard of proof, and in the absence of heroic efforts by the mother or significant additional services provided by the department, there would be no parent-child bond by the time of the termination hearing.

This court has not had the opportunity to consider whether the principle we relied on in *In re Valerie D.* would apply to a petitioner who is a private party. The Appellate Court, however, has extended the holding of *In re Valerie D.* to apply to a custodial parent whose conduct inevitably led to the noncustodial parent's lack of an ongoing parent-child relationship. In *In re Carla C.*, supra, 167 Conn. App. 251, the court concluded that, under those circumstances, the petitioner was precluded from relying on the lack of an ongoing parent-child relationship as a basis for termination. Specifically, the court held that "a parent whose conduct inevitably has led to the [other parent's] lack of an ongoing parent-child relationship may not terminate parental rights on this ground." Id., 262. The petitioner in that case, the mother and custodial parent of the child, used her status as the custodial parent and engaged in conduct that interfered in a variety of ways with the ability of the father, who was incarcerated, to maintain a relationship with the child. The mother's interference with the father's efforts to maintain contact with the child began after she "met and began a relationship with [Steve], whom she described as a 'real man' and '[the]

father figure that [Carla] deserves.' " Id., 252. The mother's interfering conduct included the following. She obtained an order from the MacDougall-Walker Correctional Institution, where the father was incarcerated, directing him to cease all oral and written communication with her and the child, either directly or through a third party, or face disciplinary action. Id., 253. She also threw away cards and letters that the father had sent to the child, without first showing them to the child. Id. She later successfully moved to suspend the father's visitation, on the basis that the existing arrangement, which relied on the paternal grandmother to facilitate visitation, had proven unworkable. Id., 255–56. Under those circumstances, the Appellate Court concluded, the mother was precluded from relying on the lack of an ongoing parent-child relationship as a ground for termination of the father's parental rights because it was her conduct that had inevitably led to the lack of that relationship. Id., 262.

We agree with the Appellate Court that the reasoning of *In re Valerie D.*, supra, 223 Conn. 492, should extend to individuals who are custodial parents or guardians. We observe that, in *In re Carla C.*, supra, 167 Conn. App. 280, the Appellate Court accurately characterized the mother's conduct as "interference." The concept of "interference" fit particularly well with the facts of that case. We consider it unnecessary, however, as a general rule, to limit the exception that we set forth in *In re Valerie D.* to instances in which the actions of a custodial parent or guardian necessarily constitute "interference." That term carries with it the connotation that the conduct at issue was undertaken with the express purpose of preventing the noncustodial parent from having access to the child. The question is not whether a petitioner—the department or a private party— intends to interfere with the noncustodial parent's visitation or other efforts to maintain a relationship with the child. For example, there was no suggestion in *In re Valerie D.*, supra, 223 Conn. 492, that the department filed coterminous petitions with the express purpose of preventing the mother from having access to her child, nor did the department's intent play any part in our analysis. It was sufficient that the department's conduct inevitably led to the lack of an ongoing parent-child relationship. Id., 533. Our inquiry properly focuses not on the petitioner's intent in engaging in the conduct at issue, but on the consequences of that conduct. In other words, the question is whether the petitioner engaged in conduct that inevitably led to a noncustodial parent's lack of an ongoing parent-child relationship. If the answer to that question is yes, the petitioner will be precluded from relying on the ground of "no ongoing parent-child relationship" as a basis for termination regardless of the petitioner's intent—or not—to interfere.

In summary, the following is the proper legal test to

apply when a petitioner seeks to terminate a parent's rights on the basis of no ongoing parent-child relationship pursuant to § 45a-717 (g) (2) (C). We reiterate that the inquiry is a two step process. In the first step, a petitioner must prove the lack of an ongoing parent-child relationship by clear and convincing evidence. In other words, the petitioner must prove by clear and convincing evidence that the child has no present memories or feelings for the natural parent that are positive in nature. If the petitioner is unable to prove a lack of an ongoing parent-child relationship by clear and convincing evidence, the petition must be denied and there is no need to proceed to the second step of the inquiry. If, and only if, the petitioner has proven a lack of an ongoing parent-child relationship, does the inquiry proceed to the second step, whereby the petitioner must prove by clear and convincing evidence that to allow further time for the establishment or reestablishment of the relationship would be contrary to the best interests of the child. Only then may the court proceed to the disposition phase.

There are two exceptions to the general rule that the existence of an ongoing parent-child relationship is determined by looking to the present feelings and memories of the child toward the respondent parent. The first exception, which is not at issue in the present case, applies when the child is an infant, and that exception changes the focus of the first step of the inquiry. As we have explained, when a child is "virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence," it makes no sense to inquire as to the infant's feelings, and the proper inquiry focuses on whether the parent has positive feelings toward the child. *In re Valerie D.*, supra, 223 Conn. 532. Under those circumstances, it is appropriate to consider the conduct of a respondent parent.

The second exception, which is at issue in this appeal, applies when the petitioner has engaged in conduct that inevitably has led to the lack of an ongoing parent-child relationship between the respondent parent and the child. This exception precludes the petitioner from relying on the lack of an ongoing parent-child relationship as a basis for termination. Under these circumstances, even if neither the respondent parent nor the child has present positive feelings for the other and, even if the child lacks any present memories of the respondent parent, the petitioner is precluded from relying on § 45a-717 (g) (2) (C) as a basis for termination.

In view of the foregoing principles, it is clear that the Appellate Court correctly concluded that the trial court applied an incorrect legal test to deny the petitions to terminate the respondent's parental rights. Nowhere in the trial court's decision did the court suggest that it had determined that the conduct of the grandparents or their alleged interference inevitably led to the lack

of an ongoing parent-child relationship between the respondent and the children. The only conduct of the grandparents that the trial court pointed to in its decision was their failure to provide the respondent with updates about the children and to tell the children the truth about the reason for the respondent's incarceration.

As to the updates, the court provided no explanation as to how those updates, even if the respondent had received any, would have affected the children's feelings toward him. We also observe that, at the termination hearing, the respondent conceded that the protective order rendered it impossible for the grandparents to provide any such updates to the respondent.

Similarly, the trial court did not explain how the children's feelings toward the respondent would have improved had the grandparents told them the truth— that their father was incarcerated for sexually assaulting their aunt when she was between seven and twelve years old. See *State* v. *Daniel W.*, supra, 180 Conn. App. 80–81. We observe that the court suggested that the children's negative feelings toward the respondent were at least in part due to the false information provided to them by the grandparents, including both the initial failure to provide any explanation for the respondent's absence and the subsequent false explanation provided to the children—that the respondent was incarcerated for beating J. That suggestion falls far short of the required determination for purposes of applying the exception—that the false information provided to the children by the grandparents inevitably led to the lack of an ongoing parent-child relationship. In the absence of a determination that the grandparents engaged in conduct that inevitably led to the lack of an ongoing parent-child relationship, the trial court improperly concluded that the exception applied.

We further observe that the department's studies submitted to the court in connection with the petitions for temporary custody and removal of guardianship, both of which were admitted into evidence at the termination hearing, reflect that the children had witnessed the respondent beating J. According to the studies, the department received a referral on June 14, 2013, alleging physical and emotional neglect of Jacob, N and C by the respondent and J. The department's investigation of the allegations revealed that, on June 6, 2013, J reported to the police that the respondent had placed her in a headlock and hit her in the face several times in the presence of all three children. Jacob confirmed J's account, informing the police when questioned that he had witnessed the respondent hitting J, despite Jacob's pleas to the respondent to "stop," and that he had seen the respondent "physically hurting" J on a prior occasion. The respondent admitted that the children were present during the incident. As a result of

the investigation, the allegation of emotional neglect was substantiated regarding Jacob. At the termination hearing, the respondent did not challenge the evidence that the children had witnessed him beating J.

In light of this evidence, the trial court's failure to provide any explanation as to how the grandparents' prevarication to the children prejudiced them against the respondent is puzzling. The only misrepresentation conveyed to the children was that the domestic violence was the reason for the respondent's incarceration. If anything, the grandparents' prevarication painted the respondent in a more favorable light than the facts warranted. Rather than inform the children of the new information about their father's incarceration that likely would have reinforced or even increased their already negative feelings toward the respondent, the grandparents told the children that he was in prison for a misdeed of which the children were already aware and had personally witnessed. Evidence was presented at trial that the children were unaware that the respondent had been convicted of sexually assaulting their aunt. Accordingly, by determining that the grandparents had prejudiced the children against the respondent when they attributed his incarceration to the domestic violence against J that the children had witnessed, the trial court implied that the children somehow would have held more positive views of him if they had known that he not only had beaten their mother but had also been convicted of sexually assaulting their aunt.

It is significant that the trial court acknowledged that it was the protective order that prevented the respondent from contacting the children, rather than any actions of the grandparents. It is undisputed that the grandparents played no role in setting the protective order. Accordingly, the present case is distinguishable from *In re Carla C.*, supra, 167 Conn. App. 253, in which the petitioner mother obtained an order from the prison barring the respondent father from all oral or written communication with her and the child. Because protective orders are commonly issued in cases of sexual assault, applying the rule of *In re Valerie D.*, supra, 223 Conn. 492, and *In re Carla C.*, supra, 253, to the present case would yield the bizarre result that a noncustodial parent who has been convicted of a sexual assault that results in a protective order that has the direct or practical effect of preventing the parent from maintaining a relationship with his or her child would nonetheless automatically be immune from termination on the basis of no ongoing parent-child relationship.

Even if the trial court had determined that the grandparents had engaged in conduct that inevitably prevented the respondent from maintaining a relationship with his children, the court's subsequent analysis did not properly apply the applicable exception. Specifically, rather than concluding that, as a result of the

court's finding of "interference," the petitioner was precluded from seeking termination of the respondent's parental rights on the basis of no ongoing parent-child relationship, the court appears to have determined that the conduct of the grandparents justified a departure from the ordinary inquiry as to whether the petitioner had proven no ongoing parent-child relationship. That is, in denying the petitions, rather than considering the children's feelings, the trial court looked to the respondent's conduct.

As we have explained, however, an inquiry that focuses on the conduct of the respondent parent to resolve a petition for termination on the basis of § 45a-717 (g) (2) (C) is appropriate only upon a finding by the trial court that a child is "virtually" an infant whose present feelings and memories cannot be determined by the court. See *In re Valerie D.*, supra, 223 Conn. 532. An inquiry that focuses on a respondent parent's conduct also is the key inquiry under the abandonment ground pursuant to § 45a-717 (g) (2) (A); see, e.g., *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 14, 438 A.2d 801 (1981) ("[a]bandonment focuses on the parent's conduct"); the court already had independently addressed and rejected the ground of abandonment in its memorandum of decision, applying the correct principles to that ground. An inquiry similar to that of the abandonment ground cannot be applied to assess whether a petitioner has established a lack of an ongoing parent-child relationship unless the child is an infant at the time of the inquiry. The court made no finding that any of the children, even the youngest child, was an infant at the time of trial.[5] The trial court, therefore, improperly considered the respondent's conduct in determining that the petitioner had failed to prove a lack of an ongoing parent-child relationship. Because no exception to the general rule applied under the facts found by the trial court, the court's inquiry properly should have focused on the present feelings and memories of the children.[6] The Appellate Court properly concluded that the trial court had applied an incorrect legal test to determine whether the petitioner had proven the lack of an ongoing parent-child relationship.

II

We next turn to the respondent's claim that, even if the trial court applied an incorrect legal test to conclude that the petitioner failed to prove the lack of an ongoing parent-child relationship, we must reverse the Appellate Court's judgment on the basis that the trial court found that the petitioner had failed to prove by clear and convincing evidence that allowing the respondent additional time to reestablish the parent-child relationship would be detrimental to the best interests of the children. We agree with the petitioner, however, that the trial court's finding was clearly erroneous.

We begin by observing that the trial court correctly

turned to the second prong of § 45a-717 (g) (2) (C) only after first addressing whether the petitioner had established the first prong—whether the petitioner had established the lack of an ongoing parent-child relationship. Although a petitioner must establish both prongs by clear and convincing evidence, and, accordingly, a petition may fail under either prong, the inquiries under the two prongs are intertwined. That is, logic dictates that the question of whether it would be detrimental to the children's interests to allow further time for the development of a parent-child relationship will depend to some extent on the findings made and reasoning employed by the trial court in resolving whether there was an ongoing parent-child relationship. See, e.g., *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 675–76; *In re Carla C.*, supra, 167 Conn. App. 265; *In re Michael M.*, supra, 29 Conn. App. 128; *In re Juvenile Appeal (84-3)*, supra, 1 Conn. App. 480.[7]

The trial court, however, did not provide any analysis as to the second prong of § 45a-717 (g) (2) (C). Instead, the court grounded its decision on the conclusory finding that "[t]here was no evidence presented by the petitioner at trial that would support a claim that additional time to reestablish a relationship with the children would be detrimental [to their best interests]." That finding cannot be reconciled with the record, which reveals that there *was* evidence presented that was relevant to this question.

"Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Powell-Ferri* v. *Ferri*, 326 Conn. 457, 464, 165 A.3d 1124 (2017).

In arriving at its finding that the petitioner had presented no evidence that it would be detrimental to allow the respondent more time to develop or reestablish a relationship with the children, the trial court did not accord any effect to evidence that had been presented at trial that was relevant to that precise question. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. By finding that no evidence was presented as to the second prong, the court did not consider the negative feelings that Jacob and N had expressed toward the respondent, despite the fact that the court made a finding that the children had those negative feelings.[8] Specifically, evidence was presented during the termination hearing that both Jacob and N had told department social workers that they "hate,"

"fear," and "distrust" the respondent. The court also had evidence before it that Jacob had told his teachers at school that the respondent was a "bad parent" and that both Jacob and N had told a department social worker that they did not want *any* present contact with the respondent. Indeed, as of the time of trial, none of the children was requesting opportunities to visit with or speak to the respondent, and both Jacob and N had indicated that they never wanted to see him again. Both Jacob and N specifically refused to call him "Dad," insisted on referring to him by his first name, and indicated that they wished to have their last name changed. Regarding C, who was approximately four years old at the time of trial, the court heard evidence that she had no present recollection of the respondent. The intensity of the negative feelings that Jacob and N harbored toward the respondent, as well as C's lack of any memory of him, was highly relevant to the likelihood that the respondent could succeed in reestablishing a relationship with them, and, if so, how long that would take. The court should have been considered both of those factors in determining whether allowing more time would have been detrimental to the children's best interests.

It is particularly problematic that the court provided the same explanation for its refusal to consider the negative feelings of Jacob and N toward the respondent that it had provided for its conclusion that the grandparents had "interfered" with the respondent's efforts to maintain a relationship with them. As we explained in part I of this opinion, one of the flaws of the trial court's analysis of the first prong of § 45a-717 (g) (2) (C) was its determination to discount the negative feelings of the children on the basis of the grandparents' alleged "interference." The trial court relied on that same principle in declining to consider the children's negative feelings in the second prong. Thus, the court's finding as to the second prong suffers from the same flaw. Specifically, in its analysis of the first prong, the court discounted those negative feelings on the basis that the children had been biased against the respondent as a result of the grandparents' failure to tell them that he was incarcerated because he was convicted of sexually assaulting their aunt. As we explained in part I of this opinion, this aspect of the trial court's reasoning is questionable at best. Moreover, the grandparents' false explanation of the reason for the respondent's incarceration has no relevance whatsoever to C's lack of any memories of the respondent. The court took no account of the fact that C did not remember the respondent. This failure cannot be reconciled with the " 'paramount importance' " of the feelings of the child in the application of § 45a-717 (g) (2) (C). See *In re Alexander C.*, 67 Conn. App. 417, 422, 787 A.2d 608 (2001), aff'd, 262 Conn. 308, 813 A.2d 87 (2003).

In addition to expressly declining to consider the

relevant evidence regarding Jacob's and N's negative feelings toward the respondent, the court failed to consider significant, additional relevant evidence that had been presented, which would have supported a finding that allowing further time for a relationship to develop would be detrimental to the children's best interests. The elephant in the room, so to speak, was the protective order. As we have noted, even the respondent conceded at trial the overarching preclusive effect that the protective order had on his ability to maintain a relationship with the children. We note that the respondent has not claimed that he ever attempted to have the protective order modified. See id., 425 (deeming respondent parent's failure to seek modification of protective order relevant to analysis under § 45a-717 [g] [2] [C]). That order, which will remain in effect until 2068—long after the children reach adulthood—would function as a significant obstacle to any future efforts that the respondent might make to reestablish a relationship with the children. It is also relevant that the respondent will not be released from prison until 2043, long after the children have reached adulthood. See *In re Elvin G.*, supra, 310 Conn. 514–15 (recognizing that, although incarceration cannot be sole basis for termination of parental rights, courts properly may consider length of incarceration and its effects on parent-child bond). The court also failed to take into account the positions of the department, the guardian ad litem, and the attorney for the minor children, all of whom recommended termination of the respondent's parental rights. The department based its position in part on its conclusion that, with the protective order in place and the respondent incarcerated, the respondent could not be expected to be able to reestablish a relationship with the children until they reached adulthood. The unlikelihood that the respondent will be able to reestablish a relationship with the children prior to adulthood is relevant to the question of whether allowing further time would be detrimental to the best interests of the children. This court has repeatedly recognized that "stability and permanence" are "necessary for a young child's healthy development." *In re Egypt E.*, supra, 327 Conn. 531; see also *In re Davonta V.*, 285 Conn. 483, 495, 940 A.2d 733 (2008) ("[t]ermination of a biological parent's rights, by preventing further litigation with that parent, can preserve the stability a child has acquired in a successful foster placement and, furthermore, move the child closer toward securing permanence by removing barriers to adoption").

In light of the abundance of evidence in the record contrary to the trial court's statement that there was *no evidence* presented that it would be detrimental to the best interests of the children to allow additional time for the respondent to develop a relationship with them, we are left with a firm conviction that a mistake has been made and, therefore, conclude that the trial

court's finding was clearly erroneous.

We emphasize that we take no position as to whether the trial court, after considering all of the relevant evidence, properly could have found that the petitioner failed to prove by clear and convincing evidence that it would be detrimental to the children's interests to allow the respondent more time to reestablish the relationship. Our conclusion that the trial court's finding was clearly erroneous is predicated on the court's reliance on its determination that the petitioner had presented *no evidence* relevant to this issue. That determination finds no support in the record. The trial court's failure to consider its own express factual findings regarding Jacob's and N's negative feelings toward the respondent, to provide any relevant explanation for discounting its finding that C had little to no memory of the respondent, as well as to acknowledge the abundant, additional relevant evidence pertaining to this issue leaves us with a firm conviction that a mistake has been made.[9] The court should have considered all of the relevant evidence before resolving the issue.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, MULLINS and VERTE-FEUILLE, Js., concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** February 15, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] This court granted the respondent father's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly reverse the trial court's judgment[s] denying the custodian's petition[s] to terminate the father's parental rights when it determined that the trial court's judgment[s] [were] legally and logically inconsistent?" *In re Jacob W.*, 328 Conn. 902, 177 A.3d 563 (2018). After hearing the parties and considering the case more fully, we conclude that the certified question does not properly frame the issues presented in the appeal because it inaccurately reflects the holding of the Appellate Court. The Appellate Court reversed the judgments of the trial court on the basis that the trial court applied an incorrect legal test to determine whether the petitioner had proven the lack of an ongoing parent-child relationship. *In re Jacob W.*, 178 Conn. App. 195, 198–99, 172 A.3d 1274 (2017). We therefore rephrase the certified issue as whether the Appellate Court properly reversed the trial court's judgments on the basis that the court applied an incorrect legal test to deny the petitions. See, e.g., *Stamford Hospital* v. *Vega*, 236 Conn. 646, 656, 674 A.2d 821 (1996) (court may rephrase certified question to more accurately reflect issues presented on appeal).

[2] As the Appellate Court explained, "[t]he maternal grandmother is the petitioner pro forma. Both maternal grandparents are currently custodians, and the maternal grandfather signed the applications for termination of parental rights . . . ." *In re Jacob W.*, 178 Conn. App. 195, 198 n.1, 172 A.3d 1274 (2017).

[3] Because we do not rest our affirmance of the judgment of the Appellate Court on the basis of any inconsistent statements in the trial court's memorandum of decision, we need not resolve whether the Appellate Court properly concluded that any inconsistent statements in the memorandum of decision required the conclusion that the trial court applied an incorrect legal test.

[4] Because the children were not in its custody, the department was unable to assist the respondent.

[5] The respondent reiterates his claim, rejected by the Appellate Court; *In re*

*Jacob W.*, supra, 178 Conn. App. 209 n.12; that the "virtual infancy exception" should apply to C, who was one year old at the time of the respondent's incarceration. As the Appellate Court acknowledged, the parties "concede" that the virtual infancy exception applied to C. Id. That court correctly concluded, however, that the parties' concession was irrelevant. The trial court did not rely on the virtual infancy exception and made no finding that C qualified as an infant. We further observe that the parties are incorrect. It is not C's age at the time of the respondent's incarceration three years prior to the termination hearing that controls for purposes of the application of the virtual infancy exception, but C's age, four years old, at the time of the termination hearing. To determine whether a petitioner has established the lack of an ongoing parent-child relationship, the trial court must be able to discern a child's present feelings toward or memories of a respondent parent. The virtual infancy exception takes account of the particular problem that is presented when a child is too young to be able to articulate those present feelings and memories. See *In re Valerie D.*, supra, 223 Conn. 532 (referring to difficulty of trial court's discerning child's "present" feelings). It would make no sense to require a trial court to resolve whether a child's feelings *could have been determined* at some time prior to the termination hearing. The inability of the court to discern or to be presented with evidence regarding a virtual infant's present feelings drives the exception. That finding must be made at the time of the termination hearing. The present case serves as an apt illustration. The trial court had no difficulty discerning C's present memories of or feelings toward the respondent. The court expressly found that C had "little to no memory" of him. Accordingly, there was no need to apply the virtual infancy exception.

[6] The respondent contends that, even if we conclude that the Appellate Court properly held that the trial court applied an improper legal test to conclude that the petitioner had failed to prove the lack of an ongoing parent-child relationship, the error was harmless because the trial court independently determined in the disposition phase that termination was not in the best interests of the children. The respondent's claim ignores the fact that the trial court's analysis of the best interests of the children was affected by its application of an incorrect legal test during the adjudicatory phase. The court's consideration of the children's best interests reflects the same focus on the facts that the court improperly relied on in concluding that the petitioner had failed to prove no ongoing parent-child relationship. Specifically, in determining that termination was not in the best interests of the children, the court relied heavily on the possible motives of the grandparents in failing to tell the children the true reason for the respondent's incarceration, the efforts that the respondent had made to maintain a relationship with the children, and the grandparents failure to provide updates about the children to the respondent.

[7] We emphasize that our decision today is grounded in our review of the trial court's analysis of *both* prongs of § 45a-717 (g) (2) (c).

[8] We note that the court also found that Jacob had previously had more positive feelings toward the respondent. It is the child's *present* feelings and memories, however, that are relevant for purposes of § 45a-717 (g) (2) (C).

[9] Of course, because this court cannot engage in fact-finding, we cannot go any farther than to conclude that the trial court's finding—that there was no evidence in the record to support the petitioner's claim that allowing further time for a parent-child relationship to develop would be detrimental to the children's best interests—was clearly erroneous. Accordingly, we disagree with the dissent's statements that the majority opinion "awards the petitioner no real practical relief" and that it would have been appropriate for this court to direct judgment terminating the respondent's parental rights. The petitioner did not request that this court order a directed judgment. Even if she had, we could not order that relief. Our decision today merely affirms the judgment of the Appellate Court setting aside the denial of the petitions. The respondent retains the right to present evidence and to hold the petitioner to her burden of proof. The proper venue for the respondent to exercise that right is in the trial court. The petitioner received the sole relief that she sought from this court: the affirmance of the judgment of the Appellate Court, which remanded the case to the trial court for a new termination hearing. Further, whether the petitioner would file new petitions for termination if we were to reverse the judgment of the Appellate Court is not relevant to our decision today.